MEMORANDUM AND ORDER
 

 FRANK J. MURRAY, Senior District Judge.
 

 This complaint for judicial review is brought by members of the School Committee of the City of Melrose (Committee)
 
 *755
 
 against the defendants Massachusetts Department of Education (Department), and John and Jane Doe (parents of Joseph Doe), pursuant to the “Education of the Handicapped Act”, 20 U.S.C. § 1401
 
 et seq.,
 
 and concerns the educational needs of Joseph Doe.
 
 [1]
 

 All parties agree that Joseph is a handicapped child, “having specific learning disabilities, who because of those impairments need[s] special education and related services”. 45 C.F.R. § 121a.5 (1980).
 
 See generally
 
 20 U.S.C. §§ 1401-20 (providing federal aid for education of handicapped); Mass.Gen.Laws Ann. ch. 71B (West Supp. 1981) (providing for education of children with special needs).
 

 Judicial review is sought by the Committee of the findings and decision by the Department’s Bureau of Special Education Appeals (Bureau), rendered June 12, 1980. 20 U.S.C. § 1415(e). As appears in. the complaint and record, a hearing was held before a hearing officer of the Bureau as a result of the parents’ rejection of the Committee’s individualized education program (IEP),
 
 see
 
 20 U.S.C. § 1401(19), proposed for Joseph for the school year 1979-80. The hearing officer found that the IEP for the school year 1979-80 was inadequate and inappropriate to meet Joseph’s special needs, and that the educational program outlined for Joseph for 1980-81 by the Committee was also inadequate and inappropriate, and ordered that in the school year 1980-81 Joseph be placed in Landmark School, a private day school, at the expense of the Committee. The Committee was further ordered to reimburse the parents for the expense they had incurred to obtain an independent educational evaluation of Joseph on or about December 4, 1979.
 

 The Committee, claiming to be aggrieved by the findings and decision, seeks by this complaint for judicial review to have the court set aside the decision. The case came on to be heard by the court on July 8, 1981 on the records of the administrative proceedings before the Bureau,
 
 [2]
 
 as supplemented by additional documentary evidence submitted by the Committee and assented to by the defendants, namely, the “Hearing Officer’s Manual”. The issues were submitted by the parties on their written briefs and oral arguments. Because judicial review has been invoked under the federal procedure and standards provided by 20 U.S.C. § 1415, the court will disregard any arguments and contentions of the parties founded upon inconsistent state review provisions.
 
 See Burlington v. Dept. Educ. of The Comm. of Mass.,
 
 655 F.2d 428 at 431-432 (1st Cir. 1981).
 

 
 *756
 
 I
 

 The court first addresses the contention of the Committee that neither the proposed educational program outlined for Joseph for 1980-81 nor any evidence concerning it was properly before the hearing officer. See Plaintiffs’ Memorandum filed November 14, 1980, at 20-22. The argument based on this contention is that any findings or orders of the hearing officer relating to the 1980-81 school year are unsupported by the administrative record.
 

 The record is clear that the Committee and the parents agreed, with certain reservations, that the 1980-81 educational program for Joseph would be dealt with prospectively at the hearing.
 
 [3]
 
 The parties and the hearing officer recognized that the lateness of the hearing in the 1979-80 school year would result in a waste of everyone’s time and would not serve Joseph’s best interests if the hearing was limited merely to the 1979-80 IEP. In accordance with the understanding of the parties, the hearing officer proceeded to receive a tentative draft of a plan for 1980-81 (Ex. SII-10), and oral testimony. The Committee called as witnesses at the hearing on May 12, 1980 seven teachers in the Melrose schools, including Carolyn Buckley, the Learning Disabilities Supervisor. Each had taught Joseph during his schooling, each had participated in implementing the educational program for the school year 1979-80, and each gave testimony concerning Joseph’s educational needs. In the testimony, including the cross-examination by parents’ counsel, the witnesses were examined concerning recommendations as to the teaching and classroom programs which should be pursued in the school year 1980-81 in their respective educational subjects. Tr. II, 5— 72.
 

 After the decision was rendered, no steps were taken by the Committee to have the hearing reopened, pursuant to provisions of the Hearing Officer’s Manual,
 
 [4]
 
 nor did the Committee seek to offer additional evidence to this court, pursuant to 20 U.S.C. § 1415(e)(2), concerning the educational plan for the school year 1980-81. The Committee had ample opportunity following the issuance of the findings and decision on June 12, 1980 to have invoked one or both procedures seeking to present additional available evidence which might warrant a change of any recommendations made by witnesses called by the Committee. The Committee apparently was satisfied to submit and argue its case for the 1980-81 year in detail on the record before the hearing officer, as shown by its brief submitted May 23, 1980. (Ex. SII — 14). The court rejects the argument that the Committee was not afforded the opportunity to present evidence of proposed modification of the tentative draft or testimonial outline (see Plaintiffs’ Memorandum,
 
 supra
 
 at 21), and rules that the evidence presented to the hearing officer concerning the 1980-81 school year is properly part of the record before this court.
 

 
 *757
 
 II
 

 The court makes the following findings of fact based upon the preponderance of the evidence in the records of the administrative proceedings before the Bureau (supplemented as above described), and in consideration of the briefs and arguments of the parties.
 

 A
 

 The named plaintiffs, members of the School Committee of Melrose, constitute the official board which is charged with the responsibility of administering the public schools of the City of Melrose, and which is the local educational agency that receives assistance under 20 U.S.C. §§ 1411 — 1420 (Subchapter II, “Education of the Handicapped Act”) for education of handicapped children.
 

 The defendant Department, an agency of the Commonwealth of Massachusetts, is charged with the responsibility of administering the provisions of Mass.Gen.Laws, ch. 71B to children with special educational needs, and conducting hearings under ch. 71B.
 

 The defendants John and Jane Doe reside in Melrose, and are the parents of Joseph Doe, a handicapped child as defined by the “Education of the Handicapped Act”, who was born July 30, 1967.
 

 Joseph entered the public schools of Mel-rose at the kindergarten level, and has received special education assistance since 1974 as part of the Melrose “learning disabilities program”. At least as early as 1973 tests demonstrated that Joseph had severe learning disabilities. His levels of achievements in verbal studies and mathematics throughout his schooling consistently demonstrate that his achievements have lagged the norm of children of his age. His intellectual calibre as measured by the I.Q. scores is in the range of low normal to normal; however, severe learning disabilities persist in speech, language, reading and mathematics.
 

 Beginning in the second grade Joseph became conscious of his poor school performance, which resulted in his feeling inadequate to accomplish the school work.His schoolroom performances have been marked by frequent outbursts of frustration and crying spells. At home he has berated himself for being “stupid”, and his sense of inadequacy in school has been manifested by crying spells, expressions of his low self-image, and by the lack of close friends. This sense of inadequacy in school has continued throughout the elementary grades. His negative self-image and defeatist attitude have been apparent to his teachers. Joseph has found it difficult at times to cooperate with the school’s program because of his sense of inadequacy and frustration, and his short attention span to the task at hand.
 

 The parents have sought advice outside the Melrose school system for determination of the severity of Joseph’s learning disabilities, and for formulation of suggested plans to meet his special needs. In 1973 he was tested at the language clinic of the Massachusetts General Hospital; in 1976 tests were given at the Children’s Hospital, with follow-up evaluation reports in 1978; in 1978 he was tested at the Landmark School; in 1979 an independent evaluation was conducted at the Tufts New England Medical Center by Dr. Reed, a neuropsychologist, and by Dr. Owens, a psychoeducation specialist. These tests and evaluations confirmed prior determinations by the parents, teachers, and professionals in the Melrose schools, that Joseph’s response to the school programs has not significantly reduced the level of his severe learning disabilities.
 

 Joseph needs to gain self-confidence and to overcome his sense of inadequacy to accomplish school assignments in his studies. He desires very much to take his place as “one of the kids” among the other school children of his age, rather than be singled out as an unsuccessful member of the class. Although he was in the seventh grade when the hearing before the Bureau was held, he was three to four years behind the academic norm of the seventh grade class in reading, in sound-symbol relationships, in spelling, and in mathematics, and thus deficient and,
 
 *758
 
 in his view, unsuccessful in these major studies. Joseph’s poor self-image, and sense of inadequacy in facing up to school tasks, are generally regarded by his parents, teachers, and professionals in the field of education who have evaluated him, as serious obstacles to reducing the current level of his learning disabilities.
 

 B
 

 In 1978 the Committee proposed an IEP (designated 502.4)
 
 [5]
 
 for Joseph for the school year 1978-79, his sixth grade year, which the parents rejected and which on appeal the Bureau found adequate on March 28, 1979. However, the 502.4 program was not proposed for the year 1979-80, Joseph’s entering year into Junior High. Carolyn Buckley, learning disabilities supervisor, explained that the Melrose schools had never provided a 502.4 program in Junior High, and that she would not recommend a change in that policy for 1979-80. She admitted that there were as many as twelve children with severe learning disabilities, similar to Joseph’s, due to enter Junior High for the 1979-80 year, but insisted that these circumstances would not alter her decision, — and they did not.
 

 The Committee proposed an IEP, designated 502.3 (Ex. SII-1), for Joseph for 1979-80, when the 502.4 program which provided for a “substantially separate program” was deemed not available. The 502.3 program required Joseph to be enrolled in the regular education program within the regular public school facilities, except that for as much as 60% of the class time each day he might be removed from the regular program and classroom for special education services. The parents rejected the proposal for the 502.3 IEP and appealed to the Bureau. Miss Buckley admitted that during the school year 1979-80 the total of special education services provided Joseph amounted to only 25% of the class time each day, resulting for all practical purposes in the conversion of the 502.3 IEP to the low end of a 502.2 prototype. The cutback in special education services in the 1979-80 school year eliminated three sessions weekly of individual tutoring in reading, because there was “no room” in Joseph’s schedule for them. There were also reductions in the amount of small group instruction in social studies, and in the sessions of speech therapy. In the tentative draft of the IEP for 1980-81 (Ex. SII-10), prepared in April 1980, Joseph’s verbal and mathematics skills were noted as follows:
 

 spelling third grade level; silent reading comprehension at high third to low fourth grade level; reads paragraphs through fifth grade level “with many inaccuracies on the small words. He can write a few sentences with coaxing”; “overall scoring on the key math is 3.8 G.E.....has difficulty remembering which process to use and when”.
 

 At this stage of his schooling Joseph was not functionally literate. Moreover, he was unable to function in the task of making the correct change in simple transactions in the neighborhood stores doing errands for his mother.
 

 It is apparent that on the threshold of Joseph’s eighth grade Miss Buckley and his teachers were aware that he had failed to advance significantly during 1979-80 in functional skill levels in verbal studies and mathematics, and continued to be weak in social studies. Only in the “hands-on” tasks in the basic woodworking and science classes, which apparently he liked, did he manifest encouraging interest in the subjects. However, in woodworking the textbook was little used, and in science class, where a fourth grade text was furnished, his reading deficiencies were evident. But it is clear that only limited opportunity for progression in the “hands-on” courses would be provided Joseph. Serious obstacles to progression, especially courses in electricity, electronics and mechanics, with their emphasis on bookwork, mathematics and theory, were clearly apparent. In social studies,
 
 *759
 
 in the reading and language curriculum, and in mathematics, the need for individual attention for Joseph was glaringly obvious. He had demonstrated impaired ability to embrace learning patterns, which should be learned automatically, of word relationships, time, measurements, facts and arithmetic functions. Although individual attention was recommended, it was not provided to him. Miss Buckley acknowledged that competence in verbal studies is directly related to the rate of progress and advancement of a child, and that Joseph’s deficiencies in those studies were very evident at the threshold to the eighth grade. At this juncture in his education it was crucial, based on his age, intellectual calibre, and poor self-image, that Joseph be provided the educational environment and adequate opportunity to learn the basic skills that would enable him to overcome the deficits he then exhibited.
 

 There are repeated references in the record to the characteristics and scope of a learning and educational environment suitable and commensurate to meet Joseph’s special needs. Recommendations were made by the parents, teachers, and professionals in the field of education who have evaluated him from time to time. Although the Committee itself in 1978 proposed a substantially separate program, which, with the addition of psychotherapy, the Board on March 28, 1978 found adequate, the program was never implemented. Joseph has never had adequate or sustained exposure to a substantially separate program of individual attention, in the setting of small classes, with other children also in need of special education. There was support among his teachers for an environment of individual attention in small classes in a highly structured program of short lessons having definite goals, but Joseph’s placements in classes in mathematics and English (reading, writing, speaking and spelling) — his woefully weak subjects — made it impracticable to provide him with the recommended individual attention.
 

 In the educational programs provided Joseph from 1978, the total amount of special education fell far short of meeting his unique needs. When it was clearly apparent that he was unable to work independently, and needed to be in an environment with few distractions, no adequate attempt was made to structure such a program. He was not provided with a program structured to improve his reading skills in the social studies, science and woodworking classes, in each of which he was faced with texts at levels beyond his capabilities.
 
 [6]
 
 Although it was well known in the schools that his poor self-image and defeatist attitude were obstacles to his learning progress, no program was structured whereby he might have begun to taste success in his woefully weak subjects. Whatever progress Joseph had made in the learning disabilities programs of the Melrose schools had been minimal in the traditional academic studies, even though encouraging to
 
 a
 
 limited extent in woodworking and science. The records show that in his classroom performances, under the observation of his teachers, he was substantially below his grade placement in functional skills. Dr. Reed reported: “He is . . . much lower in his skill development than one would predict for him based on his age and I.Q. scores. The pattern of test results is quite typical for youngsters with a serious learning disability”, and recommended: “. . . what is required is that [Joseph] associate with youngsters who are, as he is — namely, normally intelligent but having severe learning disabilities”.
 

 
 *760
 
 The Committee’s outline for 1980-81 offered no substantially separate program for Joseph. Instead, it was proposed that he follow a 502.3 prototype of regular education, with 51% of his time allocated to special education services which could not be increased without the elimination of one or more classes in regular education, and Miss Buckley was loath to require any such elimination. Rather, she viewed the proposed program as best for Joseph for 1980-81. The evidence is clear that the Committee did not intend to provide a 502.4 IEP for Joseph for 1979-80 or 1980-81, and it did not intend to place him in a structured program with a small group of only learning disabled students, focused on individualized special educational needs in 1980-81.
 

 C
 

 The hearing officer found that Joseph’s educational and emotional special needs required his placement in a 502.5 program at Landmark, an approved ch. 766 facility, for the 1980-81 school year, and ordered the Committee to provide Joseph’s tuition and round-trip transportation costs at Landmark starting September 1980 through June 1981.
 

 Landmark operates as a remedial institution to provide children, having severe learning disabilities and problems of low self-esteem, with sufficient skills to return to a normalized educational program. All faculty members have gone through at least the Landmark training program for remediation of learning disabilities, and all are certified individually by the Department or are awaiting certification. The classes are small, the maximum size is eight students; in a school population of about 140 students, there are approximately 28 classes for training of skills in language arts, math, auditory discrimination and memory. Within the core program are classes in adaptive physical education, and art or woodworking. All of the programs are held five days a week. The training program in reading remediation is flexible. There are at least three approaches to reading remediation, including linguistics and phonics, and students are closely monitored as to the effectiveness of the approach. Services of a speech therapist also are available. Exposure to content in social studies and science subject matter is provided in the training programs in language arts and auditory memory functions. Supportive counseling rather than psychotherapy is provided. If psychotherapy is strongly indicated Landmark would probably not accept the student. Classes are homogeneously grouped by skill and age, in that order, and student progress is carefully monitored. The aim of the school in its educational effort is to have the student realize he is progressing successfully in his learning. Landmark, a well-known remedial institution, see
 
 Cox v. Brown,
 
 498 F.Supp. 823, 829 (D.D.C.1980), has had experience with approximately 2000 children since 1970, 80% of whom have been ready to return to other educational programs after two years.
 

 D
 

 The Education of the Handicapped Act, 20 U.S.C. §§ 1401
 
 et seq.,
 
 requires the Committee to provide Joseph with a free appropriate education. Section 1401(18) defines “free appropriate education” as follows:
 

 The term “free appropriate public education” means special education and related services which (A) have been provided at public expense, under public supervision and direction, and without charge, (B) meet the standards of the State educational agency, (C) include an appropriate preschool, elementary, or secondary school education in the State involved, and (D) are provided in conformity with the individualized education program required under section 1414(a)(5) of this title.
 

 Among the declared purposes of the Congress in enacting the provisions of the Act are assurances that handicapped children will have available to them, within time periods specified in 20 U.S.C. § 1412(2)(B), a free appropriate education which emphasizes special education and related services designed to meet their unique needs, and assurances of the effectiveness of efforts to
 
 *761
 
 educate handicapped children.
 
 See
 
 Pub.L. No.91-230 § 601, as amended by Pub.L.No. 94-142 § 3(a). The Act expresses the policy that “to the maximum extent possible” the handicapped should be educated with the nonhandicapped, but permits removal of the handicapped child from the regular classroom “only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily”. 20 U.S.C. § 1412(5)(B);
 
 see also
 
 45 C.F.R. § 121a.513(b). The provisions of section 1412(5)(B) are clear that the “mainstreaming” requirement is not absolute. It must be construed and applied without derogating from the right of the handicapped child to the education required by the Act. The law does not require that the handicapped student shall receive the best possible education, but assures that the efforts to educate will be effective and that the education shall be adequate and appropriate.
 

 The Melrose schools offered to all students, handicapped and nonhandicapped, the opportunity to learn language skills, reading, writing, mathematics, science and social studies. The evidence shows that within the prescribed curriculum, including the learning disabilities program, Joseph not only failed to achieve significant growth, but also failed to close the gap that marked him apart from his age group. This unsuccessful educational experience caused him secondary emotional problems. While his error patterns in the academic classes have been uneven, and his test performances erratic, the fact remains that on the threshold of his eighth grade year (1980-81) he was much lower in his skill development than was expected, considering his potential, and the magnitude of the gap between him and his age group peers remained substantially unchanged. Although there had been some reduction in the outbursts of frustration, his emotional problems continued to impair his educational efforts and skill development.
 

 The preponderance of the evidence establishes that Joseph’s special educational needs require an environment that would allow for: careful monitoring of his performance in verbal studies and mathematics; immediate correction of his errors; intensive daily programs of remedial training, as opposed to the developmental approach, in reading, spelling, written language expression, and mathematics; small class groups of only learning disabled students, where distractions can be quickly controlled, and where Joseph can receive individual attention to promote his understanding of the contents and concepts of studies in which his functional skills are at a low level; continuing staff interchange as to teaching of each student; inculcation in the student of a sense of achievement and accomplishment in the school tasks. Mel-rose has not provided Joseph with the educational environment to meet these needs, although it has been aware of them for some years. The IEP for 1979-80 was inadequate and inappropriate to meet them, and the educational program outlined for 1980-81 was likewise inadequate and inappropriate.
 

 An acceptable IEP for the years involved in this appeal required Joseph’s removal from a regular classroom in order to participate in an educational program having the characteristics and scope of the educational environment suitable to meet his needs. The severity of his specific learning disabilities is such that effective efforts to provide an adequate and appropriate education could not be achieved satisfactorily in regular classes at Melrose, even with the use of supplementary aids and services. The program outlined for 1980-81 falls short of addressing and meeting his specific learning disabilities. The preponderance of the evidence (1) establishes that Landmark does provide a learning disabilities program suitable and commensurate to meet Joseph’s special educational and emotional needs, and (2) supports the finding and order of the Bureau that Joseph be placed at Landmark in a 502.5 program for the 1980-81 year.
 

 Ill
 

 The Bureau’s order that Joseph be placed at Landmark expired by its terms when the
 
 *762
 
 school year 1980-81 ended, and had expired when the case came on to be heard before me on July 8, 1981. Briefs filed by the parties soon after this action was commenced on July 11, 1980 focused directly on the Bureau’s decision, the plaintiffs’ requesting that the court set aside the decision and vacate the order placing Joseph at Landmark, and the defendants arguing that the court should affirm the Bureau’s decision and enter judgment for the defendants. However, on July 8, 1981 all parties requested leave to file supplemental memoranda, which leave the court granted. These memoranda respectively address issues which were not involved in the Bureau’s decision, as appears in the summary which follows.
 

 On September 3, 1980 the court (Skinner, J.) granted plaintiffs’ motion for stay of execution of the Bureau’s decision pending determination of this complaint, and ordered Joseph to remain in his “current placement” in the Melrose School system “pending this appeal”.
 
 See
 
 20 U.S.C. § 1415(e)(3). It was in effect stated to me at oral argument on July 8, 1981, although none of the representations appear of record, that the order of the court (Skinner, J.) notwithstanding, Joseph’s parents removed him from the Melrose schools and placed him at Landmark on September 29, 1980, that Landmark has not forgiven the debt but has not attempted to collect the tuition due it, and is awaiting the outcome of this case. The court’s order (Skinner, J.) continued in force and effect from its entry, and no proceedings were taken to have it reviewed, vacated or affirmed. The parents seek reimbursement of expenses incurred for tuition at Landmark, and transportation charges, for 1980-81. In its memorandum the Department argues in substance that should this court affirm the Bureau’s decision the parents would be entitled to reimbursement. On the other hand, plaintiffs argue that in light of the court’s order (Skinner, J.), and the provisions of section 1415(e)(3), the Committee cannot be ordered to make reimbursement of the parents’ expenses incurred for the 1980-81 school year.
 

 The change in posture of the case resulting from the change in Joseph’s educational placement for 1980-81, and the expiration of the 1980-81 school year, appears to have displaced in priority the issues decided by the Bureau. Because the 1980-81 school term has ended the defendants will not be satisfied with merely an order of the court affirming the Bureau’s decision that the 1979- 80 IEP, and the outlined program for 1980- 81, are inadequate and inappropriate, and that Joseph be placed at Landmark for 1980-81. These matters now appear to have no prospective significance to the parties. Rather, the vital question seems to be: who should pay for Joseph’s placement at Landmark, and the expense of his transportation to and from Landmark, during the school year 1980-81?
 

 The question posed has not been raised by motion, amendment to pleadings, counterclaim, affidavit or other evidence. Probably the real party in interest is Landmark, who is not a party to these proceedings. Moreover, it is not shown that any other party has standing to represent Landmark’s claim before the court. While none of the statements or representations were controverted at oral argument, there were no suggestions made as to the procedural mechanism by which the new matter should be handled. Even if declaratory relief was the expected remedy, a court must be able to see from the record an actual controversy, whether all the parties in interest are before it, what effect its decision will have on them, and whether any useful purpose is to be achieved by deciding the question as presented. On this fragile record, the court in its discretion declines to declare the rights of the parents, the Committee or Landmark, and leaves to them the initiative of presenting the question by procedural mechanisms of their choice.
 

 IV
 

 In December 1979 the parents brought Joseph to Tufts New England Medical Center for an independent evaluation of his learning problems. In doing so they incurred expenses amounting to
 
 *763
 
 $186.00, which they paid. The Massachusetts Code of Regulations, 603 C.M.R. § 328.3, requires that the parents shall give notice in a timely manner to the Committee prior to scheduling such independent evaluation. Prior notice is a condition precedent to the obligation of the Committee to defray the expense of the evaluation services. The testimony of Joseph’s mother is quite clear that the independent evaluation was scheduled and the services furnished without prior notice to the Committee. (Tr. 1-49). The preponderance of the evidence establishes that the required prior notice was not given. The Bureau’s order that the Committee reimburse the parents in the amount of $186.00 for the evaluation must be reversed.
 

 y
 

 As stated above, the defendants have argued that the court should affirm the Bureau’s decision and enter judgment for the defendants. However, as the defendants now recognize, affirmation of the Bureau’s order placing Joseph at Landmark for the year 1980-81 can have no prospective effect. The parties are now facing a new school year, 1981 — 82, and a new IEP is due for Joseph. The record does not show the progress, if any, Joseph has made since this case was heard in May 1980 by the hearing officer. The parties cannot be certain that the determination of the Committee of Joseph’s IEP for 1981 — 82 will not be a repetition of what was proposed for 1980-81. Should the Committee now formulate an IEP for 1981-82 which the parents reject, it is almost certain that the process of hearing and review through the Bureau and the State Advisory Committee on Special Education will recur, with final recourse to the court under section 1415(e), in which event the case might not reach the court before the end of the 1981 — 82 year. It is thus apparent that the decision of the Bureau is capable of repetition in Joseph’s case, yet evading meaningful review, because “(1) the challenged action [is] in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there [is] a reasonable expectation that the same complaining party would be subjected to the same action again”.
 
 Weinstein v. Bradford,
 
 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975). This well-known exception to the mootness doctrine,
 
 see Southern Pacific Terminal Co. v. I. C. C.,
 
 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911), empowers the court to grant appropriate relief, section 1415(e)(2), which would extend beyond the school year 1980-81.
 

 In consideration of the foregoing findings and rulings, and in accordance therewith, it is hereby ORDERED:
 

 (1) The order of the Bureau that the Committee reimburse the parents in the amount of $186.00 for the evaluation services of the Tufts New England Medical Center be and the same hereby is reversed.
 

 (2) The claim of the parents to be reimbursed for expenses of Joseph’s tuition at Landmark for the school year 1980- 81, and for transportation expenses to and from Landmark during that year, be and the same is hereby denied without prejudice to litigating the claim upon a proper record.
 

 (3) That the Committee shall prepare an IEP for Joseph for the school year 1981- 82, and present the same to Joseph’s parents not later than October 19, 1981.
 

 (4) That should Joseph’s parents reject the Committee’s proposed IEP for 1981-82, any appeal to the State Bureau of Special Education Appeal shall be filed not later than October 22, 1981.
 

 (5) That Joseph’s educational placement shall forthwith be in a 502.5 program at Landmark for the school year 1981-82, and that the Committee shall provide Joseph’s tuition and round-trip transportation costs at Landmark beginning October 14, 1981 and, unless the court otherwise orders, through the expiration of the 1981-82 school year.
 

 (6) That in the event of an appeal by Joseph’s parents to the State Bureau
 
 *764
 
 of Special Education Appeal from the IEP proposed by the Committee for Joseph for 1981-82, the Department shall take all reasonable measures to expedite the appeal from its filing to decision.
 

 (7) That the court shall retain jurisdiction of this case pending fulfillment of the orders hereinabove entered.
 

 [1]
 

 . The complaint is brought pursuant to 20 U.S.C. § 1415(e) which provides in material part that
 

 (2) ... any party aggrieved by the findings and decision [of the State educational agency] under subsection (c) of this section, shall have the right to bring a civil action with respect ■ to the complaint presented pursuant to this section, which action may be brought ... in a district court of the United States without regard to the amount in controversy. In any action brought under this paragraph the court shall receive the records of the administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate. * * * * * *
 

 (4) The district courts of the United States shall have jurisdiction of actions brought under this subsection without regard to the amount in controversy.
 

 [2]
 

 . The administrative records comprise the following:
 

 1. Transcript of hearings before the Bureau (case no. 2940) on April 14, 1980 and May 12, 1980, as appears in two parts of one volume; one part for each day. The parts are designated Tr. I and Tr. II.
 

 2. Documentary record of the administrative proceedings in Bureau (case no. 2940), as appears as School exhibits (S II), Parents’ exhibits (P II), and Bureau exhibits (B II), in one volume.
 

 3. Documentary record of administrative proceedings in Bureau (case no. 1855), which is incorporated into Bureau case no. 2940 by reference, as appears as School exhibits (S I), Bureau exhibits (B I), and State Advisory exhibits (SAC).
 

 The deficient reproduction of the records filed with the court, due to the extensive omissions of parts of the testimony and illegibility of parts of documents in case no. 2940, adds an unnecessary burden to the review.
 

 [3]
 

 . The hearing officer proposed acceptance in evidence of the admittedly tentative draft of the 1980-81 IEP (SII-10) as a “framework” to be “fleshed out by oral testimony”. (Tr. II, 4). The parents’ counsel saw this procedure as reasonable, although the parents had had no input in the IEP, as long as they had opportunity to cross-examine Carolyn Buckley, the Learning Disabilities Supervisor at the Junior High School. The Committee’s counsel at first suggested that the hearing be postponed, but then agreed to the procedure as long as the Committee could present testimony as to the 1980-81 outline on an informal basis, without prejudice to presenting less than “all of the requirements in developing an Ed. plan”. (Tr. II, 4-5).
 

 [4]
 

 . In pertinent part the Hearing Officer’s Manual provides:
 

 Re-Opening the Hearing:
 

 When a decision has been rendered on the merits, the Bureau will allow written application to be made by a party to re-open and reconsider such cases. A re-opening may be granted upon showing of any serious error of law, misconstruction of Chapter 71B or the rules and regulations of Chapter 766, or upon the discovery of material evidence existing at the time of the hearing, but not introduced, if such contention, if proven, would alter the conclusion of the decision. The Director has the discretion to grant or deny any such application. Application should be made within a reasonable time after discovery of the defect or new evidence.
 

 [5]
 

 . The program was designated a 502.4 program, 603 C.M.R. § 502.4 (Code of Massachusetts Regulations), a substantially separate program made up entirely of children in need of special education, and provided within public school regular education facilities.
 

 [6]
 

 . In this regard the following exchange which occurred during the testimony of Miss Buckley is instructive:
 

 Hearing Officer: Excuse me. You know I just can’t let that last thing go by. It really bothers me. You think it’s okay that he get what he can out of social studies and science by his physical presence, exposure to the class even if he can’t read?
 

 Miss Buckley: That’s not just [Joseph] . . .
 

 Hearing Officer: But I did restate what you said correctly, didn’t I?
 

 Miss Buckley: (Affirmative)
 

 Hearing Officer: Okay.
 

 (Tr. I, 65).