Gloria F. MATHER, Walter Mather, IV,

v.

HARTFORD SCHOOL DISTRICT,
Jo–Anne Unruh, Iris Berezin.

No. 2:94 CV.

United States District Court,
D. Vermont.

May 16, 1996.

Sheldon M. Katz, Arend Richard Tensen, David Paul Cullenberg, Van Dorn & Cullenberg, Hanover, NH, for plaintiffs.

Georgiana Osmond Miranda, McKee, Giuliani & Cleveland, Montpelier, VT, for defendants.

## OPINION AND ORDER

SESSIONS, District Judge.

This is an appeal brought by Gloria and Walter Mather of an administrative due process hearing decision denying their petition to require the Hartford School District to pay for costs of education at Landmark School.[1] Jurisdiction is based on 20 U.S.C.A.

---

1. Plaintiffs filed a four count complaint against Hartford School District and two of its staff members. Specifically Count I constitutes the appeal from the Administrative Hearing under the Individuals with Disabilities Education Act (IDEA); Count II asserts claims under 42 U.S.C. § 1983 for violation of Plaintiff's Constitutional rights; Count III alleges violation of rights under

§ 1415(e)(2) and 16 V.S.A. § 2957. The appeal was initiated by service of an amended complaint upon the Hartford School District and two members of the Basic Staffing Team ("BST"), Jo–Anne Unruh, Ph.D., the District's director of special education, and Iris Berezin, a learning consultant for the District. The Mathers complain that the District, together with Dr. Unruh and Ms. Berezin, violated several of Walter's rights under federal and state law. The Mathers seek reimbursement for tuition costs attendant with placement of Walter at Landmark School, together with compensatory and punitive damages and attorney's fees.

The Court reviewed the Hearing Officer's Decision, records of the nine day due process hearing, and additional evidence elicited at trial on November 14, 1995. Based upon the review of that evidence, the Court affirms the Decision of the Hearing Officer and orders that Count I of the complaint be dismissed.

## BACKGROUND

1. Walter Mather (Walter) resided with his mother, Gloria Mather, in Wilder, Vermont during all times relevant to these proceedings. His date of birth is November 13, 1974.

2. Walter was educated within the Hartford School District until the middle of his junior year in high school. In January 1993, Walter left Hartford High School to attend Landmark School in Prides Crossing, Massachusetts. He continued to attend Landmark School until he was eligible for graduation in June, 1994.

3. Walter was first diagnosed as having a learning disability by the school psychologist, Leigh W. Kotkov, Ph.D. in early 1984. Dr. Kotkov found that the learning disability coexisted with an emotional disturbance. The BST did not find sufficient facts to conclude that Walter had a learning disability.

4. Walter was first declared learning disabled in 1987 when he was in the fifth grade based upon another evaluation conducted by

Dr. Kotkov, thereby making him eligible under the IDEA for special educational benefits and services. His disabilities fell within the areas of written language, reading decoding, spelling and organization skills.

5. The Individual Education Program (IEP) Team was made up of Dr. Unruh, the learning specialist who worked with Walter, his teachers, counselors and consultants. Walter and his parents were also invited to participate in the planning sessions. Dr. Unruh was the person ultimately responsible for insuring that the IEP developed by the Team was implemented appropriately, although no one person had authority to amend the plan without the consent of the entire Team. Dr. Unruh received her doctorate in special education from Union Graduate School and had been employed by the Hartford School District since 1987. She attended every Team meeting concerning Walter's IEP.

6. An IEP was developed for Walter which provided that he would receive the bulk of his education in mainstream classes, supplemented by individualized attention in the resource room with a teacher qualified to teach students with learning disabilities. Mrs. Mather objected to the IEP and requested an additional evaluation by Patricia A. Stone, Ph.D.

7. Dr. Stone's evaluation identified Walter's disability as impacting upon his reading decoding and written expression skills. She recommended more intensive individualized instruction in the resource room with a certified special educator for one hour per day. She also recommended a summer residential program.

8. The BST considered the report submitted by Dr. Stone and concurred with her observations. In academic year 1987–88, Walter attended the resource room and received individualized instruction from a certified special educator for one hour per day. Although the BST concluded that a residential program over the summer was not necessary, the District did arrange and pay for a tutoring program.

29 U.S.C. § 794 (Section 504 of the Rehabilitation Act of 1973); and Count IV contains claims for violation of Vermont Education of Handicapped Children Act under 16 V.S.A. §§ 2941–2969.

9. Dr. Stone evaluated Walter again in February 1988. She found that although his reading skills had progressed significantly, his reading decoding and writing skills had not. She recommended intensifying the individualized services provided in an expanded IEP. She also recommended that he participate in a summer residential program.

10. The BST considered Dr. Stone's findings and postponed decisions concerning summer placement until further testing could be administered in May, 1988. According to learning specialist Mary Alice Webster, who administered those tests, Walter had met goals in the areas of spelling, reading and writing. As a result, the BST rejected the option of summer residential placement and provided summer tutorial services for Walter.

11. In November 1988, the BST selected Dr. Louisa Moats, Ed.D., to do a special education evaluation of Walter. Mrs. Mather then notified the District in that same month that she did not want Walter being evaluated by any other experts. At the same time, she was having Walter evaluated by Dr. Ann Daniels, Ed.D., at the Northshore Children's Hospital.

12. Dr. Daniels submitted her evaluation in February, 1989. She found the same learning disabilities as Dr. Stone in the areas of organizational, reading decoding and written language skills. She indicated that the best placement for Walter was a total immersion program for adolescents with learning disabilities.

13. The IEP Team met with Dr. Daniels on May 9, 1989. According to the notes from that meeting, Dr. Daniels indicated that Walter was getting outstanding services in the resource room from Carol S. Galano, the resource room teacher, and that her recommendation of an immersion program represented her assessment that such a program would be the "best" placement available.

14. The IEP Team also met with Dr. Moats three days later to review Dr. Daniels' report. The Team found that Dr. Daniels findings were consistent with their assessments but felt that an immersion program was not necessary given the level of disability experienced by Walter and the ability of the school to accommodate his needs.

15. In May 1990, Mrs. Mather had Walter evaluated again by Dr. Kathleen Curran, Ph.D., a licensed psychologist employed by the Northshore Children's Hospital. Her findings were consistent with those of Dr. Daniels. She found, however, that Walter had made good progress over the past eighteen months. At a minimum, she recommended that Walter continue with the same level of services with an increase to two hours of tutoring per day.

16. The IEP for academic year 1990–91 called for the bulk of Walter's education to be in mainstream classes. He was also to be seen by Iris Berezin in the resource room for one period per day.

17. In November, 1990, as the result of a due process hearing requested by the District, the IEP Team was authorized to test Walter. The Team requested that Dr. Louisa Moats conduct the evaluation. In light of the number of evaluations of Walter's learning disabilities already conducted by others, Dr. Moats was not employed to do an additional evaluation. She was asked to review all of the assessments, conduct interviews of Walter and his mother, observe Walter in the resource room, and speak with teachers and administrators concerning Walter's educational difficulties.

18. Dr. Moats has a doctorate in reading and human development from the Harvard Graduate School of Education. She is also a licensed teacher and psychologist and has been in a clinical practice for about thirty years. She teaches at Dartmouth College, the University of Vermont and St. Michael's College and has written extensively about learning disabilities. She has worked with Hartford High School since 1985 and had been consulting with the school regarding services for Walter since 1988.

19. Dr. Moats concluded that Walter suffers from a mild learning disability in the areas of planning, organization and efficiency of output. He does not have trouble with reasoning ability, scoring high in both verbal and nonverbal areas. He also scores well in reading comprehension. She consistently

recommended that he be provided individual instruction in the resource room for at least one period per week, supplemented by counselling to address self-esteem and depression concerns. She felt that the two hours of individualized instruction in the resource room suggested by Dr. Curran was excessive.

20. Dr. Moats concurred in large part with the findings of both Dr. Daniels and Dr. Curran. However, she recommended counselling for Walter to deal with an emotional component to his disabilities. She concluded that Hartford High School provided an appropriate education for Walter and recommended against placement in a residential program outside of the school system. She has never wavered in her recommendation that residential placement is unnecessary in light of the services provided by the District. The IEP Team concurred with her findings in its meeting on February 4, 1991.

21. Dr. Moats also observed Walter in the resource room in 1991 under the supervision of Iris Berezin. Ms. Berezin has a Bachelor's Degree from U.C.L.A. and a Master's Degree from the University of Illinois in special education with a specialty in learning disabilities. She has had 15 years of experience teaching learning disabled students. She had worked with Walter since his entry into high school in 1991.

22. Ms. Berezin met with Walter for one period per day during which she used instructional materials and homework assignments to work on IEP goals. She focused on reading and organizational skills. She observed him in regular classes and coordinated his program with Walter's teachers. She was also available during a second period to help Walter with his homework assignments.

23. In early 1991, Dr. Moats wrote a letter to Dr. Unruh describing some of her observations regarding instruction being given to Walter. Dr. Moats felt that "the kind of integrated, structured tutorial designed to implement the reading and written language objectives of Wally's IEP is not in fact in place at this time." She made a number of recommendations to improve implementation of the IEP. Dr. Moats testified that the letter was not intended as a criticism of Ms.

Berezin's skills but designed only to improve the services given to Walter.

24. Based upon those recommendations, Ms. Berezin attended four workshops on working with students with disabilities in written language in May and June, 1991, as well as an intensive Orton–Gillingham program. She incorporated the subject matter of those training seminars into her work with Walter.

25. In April, 1991, the Mathers requested that Walter be placed in a residential program, preferably at Landmark School. A Team meeting was conducted on June 4, 1991 to review the appropriateness of the IEP. Over the objections of Mrs. Mather, the Team concluded that the IEP was appropriate for Walter and denied the request for residential placement.

26. The IEP for 1991–92 established goals of improving written expression, reading decoding and organizational skills. One period per day was set aside for work in the resource room. The IEP called for more intensive work on written expression.

27. Walter and his mother filed a request for a due process hearing pursuant to IDEA in early 1992. They alleged numerous procedural violations under that statute in the drafting and implementing of Walter's IEP. The Hearing Officer found that no such violations occurred during the IEP process. The Hearing Officer did not address the educational appropriateness of the IEP. The Mathers did not appeal that decision. As a result, the findings adopted in that decision are binding upon the parties.

28. In April, 1992, Mrs. Mather again requested that Walter be sent to Landmark School for residential educational programming. On April 14, 1992, the BST issued a report denying the request for residential placement. The Team found that Walter's learning disabilities were not severe and that his adjustment at Hartford High had improved. Walter had become involved in many school activities, including participating on sports teams. The Team found that Walter's socialization skills with others within the school environment had become much more positive, that his sense of self-esteem had

improved, and that placement at a residential program at that point would impede the progress that Walter had made in his ability to work with others. They also found that Walter's teachers could adjust their teaching duties to accommodate his special needs.

29. In its April 14, 1992 report, the BST recommended continuing special education services, with particular emphasis upon organizational and decoding skills. It recommended against placement at a residential program due to the negative impact it would have upon Walter's improved efforts at socialization and his self-esteem.

30. The BST met again on May 27, 1992. The Team recommended that Walter attend a summer residential program at Landmark School at the District's expense. The Landmark program was designed to focus upon his organizational skills, particularly in the areas of written language and oral reading.

31. Walter was also experiencing depression and anxiety in the spring of 1992, according to his mother. At the urging of the District, Mrs. Mather consulted with Dr. Moats. Dr. Moats recommended that Walter become involved in counselling to address these issues.

32. Walter's grades for academic year 1991–92 were the following: English C−, Geometry D+, Biology D, U.S. History D+.

33. Walter's participation in the Landmark program during the summer of 1992 was successful. Both Dr. Unruh and Ms. Berezin observed him in the classroom setting at Landmark. Their efforts in observing Walter at Landmark were designed to assist them in developing a plan for Walter's education at Hartford High School for the following year.

34. The IEP Team next met on October 28, 1992. Walter and his mother attended the meeting, which also included a representative of Landmark School. The Team developed an IEP which placed Walter in regular eleventh grade classes. The goals of the IEP remained the same: to improve organizational, written expression and decoding skills. An additional goal of improving his problem solving ability was added. Walter was to be in the resource room with a learning consultant one period per week, during which time more expansive study skill methodologies were to be implemented. He also was to receive eight to ten weeks of counselling. The plan was adopted over the objections of the Mathers, who insisted that Walter be placed at Landmark School.

35. In November, Dr. Unruh attempted to arrange for Walter to see a therapist. Although Walter had selected a therapist from those suggested by Dr. Unruh, he did not meet with the therapist prior to his leaving Hartford High School in January, 1993.

36. On November 20, 1992, Mrs. Mather wrote to the BST requesting a total immersion program at Landmark School. The Team met in December to address the request and postponed the ultimate decision to January.

37. The IEP Team met again in January, 1993 to review Walter's progress and to reconsider Mrs. Mather's request that he be placed at Landmark School. Ms. Berezin had noted progress in his reading skills over the course of the year. His grades improved during the first semester of the 1992–93 academic year. He received B's in English and passing grades in his other subjects. Ms. Berezin reported progress in all aspects of his academic program, including written language and organizational skills. The Team confirmed its earlier findings that Walter's disabilities were not severe and that both his academic and social skills were improving. The Plan recommended continuation of special education services in the resource room, focusing on written language, decoding and organizational skills. Further, the Team noted the negative effect that the conflict between the school and Walter's mother was having on his progress.

38. In late January, Mrs. Mather withdrew Walter from the District without prior notice and enrolled him at Landmark School. She requested that Walter be placed at Landmark for the academic year 1993–94 at District expense. Later, she extended the request that the District cover the costs of Walter's education at Landmark to the date of his enrollment. Mrs. Mather also in-

formed the school that Walter would not be participating in counselling.

39. The IEP Team met again on February 1, 1993. The Team reviewed a supplemental evaluation of Walter and confirmed its earlier findings that residential placement was not appropriate. The Team recommended that Walter be sent missing assignments and exams so that he could receive credit for his past semester.

40. Walter was evaluated on March 31 and April 1, 1993 at his mother's request by Dr. Barbara Roche, a licensed psychologist from Northshore Children's Hospital. Dr. Roche found that Walter was functioning intellectually within the average range, although his organizational and reading skills were below average. His reading skills were found to be below grade level. She recommended academic programming in all areas and individualized reading instruction in daily tutorials. She also expressed concern over his apparent depression and suggested that all academic work be geared toward insuring success.

41. The IEP Team reviewed Dr. Roche's report in its meeting on June 11, 1993. It concluded that her findings were consistent with Walter's IEP. The Team found that Walter's reading skills and self-esteem had improved as a consequence of implementation of the IEP. It also concluded that Walter's disabilities were not severe and could be effectively accommodated for within the school environment. The Team denied Mrs. Mather's request for placement at Landmark School and adopted a plan consisting of mainstreaming Walter in regular classes together with support from a learning specialist in the resource room and counselling. The BST also recommended against summer placement at Landmark. The IEP was rejected by Mrs. Mather.

42. Walter was also evaluated in the summer of 1993 by Dr. Robert Kemper of Psycholinguistics Associates of Salem, Massachusetts. Dr. Kemper conducted a psycholinguistic evaluation of Walter. Based upon the educational tests that he administered, Dr. Kemper concluded that Walter suffered from a severe language-based learning disorder. He recommended that Walter be placed in classes that were small in size and consisted of others with the same types of difficulties. He also recommended that his teachers be trained in language learning disabilities. He concluded that the program offered at Landmark School was the "ideal" one for Walter.

43. Landmark School is a residential program for students of average intellectual functioning with learning disabilities. It has programs in three areas: expressive language, standard remedial and college preparatory sections. Walter was placed in the remedial program since he had been functioning at below grade level. That program focused upon reading, writing and organizational skills. He was placed in small classes with educators trained in learning disabilities. He also received individualized tutoring.

44. Dr. Moats reviewed the evaluation done by Dr. Kemper and was thoroughly critical of its recommendations. She indicated that protocols used by Dr. Kemper were unreliable, that the data taken from the tests were contradictory and that a number of factors skewed the results, including the time of the taking of the test. She found evidence within the test results to confirm her observations and those of Dr. Unruh and Dr. Roche that the disabilities were mild, including the fact that Walter would use phonetics to attempt to spell words. Finally, Dr. Moats observed that the recommendations section of the report was taken almost verbatim from reports done by Dr. Kemper regarding other clients of hers who had markedly different disabilities, thereby questioning the individual attention given by the evaluator to Walter's assessment.

45. Walter made an extremely successful adjustment to the program at Landmark School. He became very active in sports and student government and was very popular with the other students. He achieved a measure of academic success and was a member of the National Honor Society. Although he was eligible for graduation in June, 1994, he chose not to receive his diploma for fear of its impact upon this lawsuit. Rather, he

walked across the stage at graduation and received an envelope without a diploma.

46. There was conflicting testimony regarding the academic progress made by Walter at Landmark. Howard Kasper, who is the head of guidance and placement at Landmark, testified to substantial increases in grade equivalency test scores in reading comprehension, from 9.7 in February 1993 to 12.8 in May 1993. Such tests scores appear to be highly volatile and may not be reliable standards by which to judge academic progress. As an example, Walter's math grade equivalency scores dropped substantially during that same period.

47. According to the testimony of Dr. Moats, who reviewed Walter's records at Landmark, experts look to the changes in standard scores or percentiles to assess progress reliably. She found no evidence of significant change as a consequence of his being at Landmark School. Even after review of Walter's performance at Landmark, she reaffirmed her view that residential placement was not necessary for him to receive an appropriate education.

48. Walter applied to three separate colleges during his last year at Landmark: University of Vermont, University of New Hampshire, and Unity College in Maine. Mr. Kasper recommended Walter to these universities without reservation. Walter was accepted at Unity College which, according to Mr. Kasper, has a strong program in assisting students with learning disabilities. The College also placed an emphasis upon studies in ecology which was of primary interest to Walter. Walter declined admission to Unity College, choosing to take a year off between Landmark School and college for personal reasons.

49. Teachers and staff made significant efforts to accommodate for Walter's disabilities. The teachers were consistent and active participants in the BST meetings concerning Walter's educational program. Techniques to address Walter's organizational difficulties were discussed and coordinated at those meetings. Teachers offered to meet with Walter outside of the classroom to help with his studies. They would assist him in reworking various drafts of papers to be submitted in their classes and accommodate his needs in the taking of tests. According to Dr. Moats' testimony during the due process hearing, the teachers were extremely supportive of Walter and willing to adjust their expectations and schedules to help him.

## DISCUSSION

### I. *Statutory Framework*

The Individuals with Disabilities Education Act, 20 U.S.C. 1401 *et seq.*, is a comprehensive scheme designed to help states meet the educational needs of children with disabilities, and it establishes an enforceable substantive right to a "free appropriate public education." [2] *Mrs. W. v. Tirozzi,* 832 F.2d 748, 750–51 (2d Cir.1987) (citing 20 U.S.C. 1400(c)). IDEA mandates that parents, teachers and representatives of local education agencies become involved in developing Individualized Education Programs (IEP's) for students with disabilities. 20 U.S.C. 1401(a)(20)(F). Numerous procedural requirements must be followed in drafting and implementing the IEP's, including annual reviews. 20 U.S.C. 1401(a)(20)(F); 1414(a)(5).

IDEA requires that parents be afforded the opportunities to be involved in the educational planning process. The IEP of a student must be developed with the participation and input of the student's family, faculty, and evaluators. (34 C.F.R. 300.344: 300.345(a)(2); Rules 2363.3, 2364.2). The IEP must identify the educational level of the student and include a statement of educational goals and objectives for the student to meet and the extent to which the student will be able to participate in the regular educational program. Parents may bring complaints about any matter relating to the child's placement. 20 U.S.C. 1415(b)(1)(E). Such complaints are to be reviewed at an impartial due process hearing conducted by the state or local education agency. 20

---

2. The present short title of the IDEA is the result of a statutory amendment effective October 1, 1990. The Act was formerly known as the Education of the Handicapped Act or the Education of All Handicapped Children Act. *See* 20 U.S.C. § 1400(a)(1)(A) (U.S.C.S.1989 and Supp.1991).

U.S.C. 1415(b)(2). If a hearing is conducted at the local level, an appeal may be taken to the state agency. 20 U.S.C. 1415(c). An aggrieved party may finally appeal to federal or state court. 20 U.S.C. 1415(e)(2).

## II. *Standard of Review*

■ The standard of review of administrative agency decisions under IDEA is set forth at 20 U.S.C. 1415(e)(2). The Court is to receive and review the records of the administrative proceeding and shall hear additional evidence within its discretion. The decision is to be based upon a preponderance of the evidence. The Court is to grant such relief as it deems appropriate. Its judgment is to be made independent of the administrative findings.

However, the Supreme Court has also recognized that courts do not have special expertise in the field of educational policy and should not substitute its judgment for those of school authorities. *Board of Education v. Rowley*, 458 U.S. 176, 206, 102 S.Ct. 3034, 3050, 73 L.Ed.2d 690 (1982). Due deference is to be afforded administrative decisions made by state officials who possess expertise in the field. *See Briggs v. Board of Education of Connecticut*, 882 F.2d 688, 693 (2d Cir.1989); *Murphysboro Community Unit School Dist. No. 186 v. Illinois State Board of Education*, 41 F.3d 1162, 1166 (7th Cir. 1994).

■ The District objects to the Court's considering evidence preceding the Hearing Officer's Decision in Docket No. 92–05. It argues that the Decision of the Hearing Officer in that case approved the IEP in place at that time, that the Mathers did not appeal that finding and are therefore bound by his conclusions. Further, the District argues that much of the evidence sought to be introduced by the Mathers occurred over two years before the filing for the due process hearing and is barred by the applicable statute of limitations.

In Docket No. 92–05, Hearing Officer Michael Hertz addressed a number of procedural questions concerning the adoption of Walter's IEP. He did not address whether the IEP was appropriate under the IDEA. Fur-

ther, the Mathers have alleged a long pattern of omissions in providing appropriate services. A complete review of the school system's actions is necessary to put the most recent IEP and actions of the District in context. See *Straube v. Florida Union Free School Dist.*, 801 F.Supp. 1164 (S.D.N.Y. 1992); *Rochester School Dist.*, 18 I.D.E.L.R. 327 (Vt. May 27, 1991). Such evidence is crucial to assess whether the current IEP meets the Act's standards of providing a free appropriate public education for Walter.

## III. *Findings*

■ The U.S. Supreme Court defined the process by which lower courts were to determine whether school districts have complied with the Individuals with Disabilities Education Act in *Board of Education v. Rowley*, 458 U.S. 176, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982). First, courts must determine whether the school district has followed the statutory procedures set forth in the Act. Next, the courts must address whether the IEP developed through those procedures is reasonably calculated to enable the child to receive educational benefits. If those two requirements are met, the school district has complied with its obligations, and the Court can require no more. *See Briggs*, 882 F.2d at 693.

The Mathers have failed to allege any procedural violations of the IDEA as part of their complaint. As a result, the only issue before the Court is whether Walter's IEP was reasonably calculated to enable him to receive educational benefits.

■ IDEA defines the "free appropriate public education" to which students are entitled as "educational instruction specially designed to meet the unique needs of the handicapped child, support by such services as are necessary to permit the child 'to benefit' from the instruction." *Rowley*, 458 U.S. at 188–89, 102 S.Ct. at 3041–42. The FAPE requirement of the Act is satisfied when the education is "sufficient to confer some educational benefit upon the handicapped child." 458 U.S. at 200, 102 S.Ct. at 3047–48. It is not necessary that the state provide the best possible education for all students, but merely an education which is likely to produce

meaningful progress. *Norris v. Massachusetts,* 529 F.Supp. 759, 767 (D.Mass.1981); *Bd. of Education v. Diamond,* 808 F.2d 987, 991 (3d Cir.1986).

■■■ The IDEA sets out a clear mandate for mainstreaming children with disabilities whenever feasible. It requires that states must establish procedures to assure that

> to the maximum extent appropriate, handicapped children, ... are educated with children who are not handicapped, and that special classes, separate schooling, or other removal of handicapped children from the regular educational environment occurs only when the nature or severity of the handicap is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.

20 U.S.C. § 1412(5)(B). Only where "the nature or severity of the handicap is such that education in regular classes cannot be achieved satisfactorily, mainstreaming is inappropriate." *Briggs,* 882 F.2d at 692. When educational placement in a program segregated from mainstream classes is considered, the court must determine whether such services can be provided in a non-segregated or mainstream environment, and if so, placement in the non-segregated classroom is required by the Act. *Roncker ex. rel. Roncker v. Walter,* 700 F.2d 1058, 1063 (6th Cir. 1983).

The Mathers raise a number of objections to both the design and the implementation of Walter's IEP. They argue that the IEP is not reasonably calculated to enable Walter to receive meaningful educational benefits. Specifically, they assert that the IEP fails (1) to provide a means to close the gap between achievement and grade level, (2) to incorporate a language-based program for his unique needs, and (3) to educate Walter concerning skills that would foster self-sufficiency and independence. As to the implementation of the IEP, the Mathers complain that the faculty and staff did not appropriately accommodate Walter's needs. Further, they allege that Walter's lack of progress showed that the District could not implement a learning program which provided educational benefits.

The District committed substantial resources to developing an IEP which met Walter's needs. The IEP Team met numerous times per year to review the existing education plan. The Team reviewed and attempted to incorporate reports from a number of experts hired by the Mathers to evaluate Walter's needs. The Team also employed Dr. Moats to make an independent assessment in 1991 and incorporated her suggestions as to how to improve the IEP. Because the plan called for daily tutorials, the District provided a significant commitment to implementing the plan that was developed by the Team.

■■■ The Mathers argue that progress was not made toward reducing the gap between Walter's level of achievement and his grade. They contend that grade levels are the appropriate standards by which to assess educational progress and that Walter remained well below grade level in his written expression, decoding and organizational skills. The argument presupposes that evaluations based upon grade levels are determinative of educational progress, an assumption the Court is unwilling to make. There are a wide number of considerations which reflect the existence of educational benefit, only one of which relates to grade level assessments. Grades, socialization skills, level of participation, consistency of effort and commitment to studies are all relevant in determining whether the whole individual has progressed in his or her education. Further, according to Dr. Moats, examinations which score grade levels are not good indicators of academic achievement. Standard scores or percentiles are better guides to assessing academic progress.

Standard test scores reflect progress made by Walter during his years at Hartford High School. His percentile of achievement in comparison with other students of his age remained constant, slightly below average in some areas and above average in others. He was becoming more adjusted in school and was actively involved in many extracurricular and sports activities. Whatever signs of depression existed in earlier years diminished toward the end of his tenure at Hartford High School. Walter testified to the difficul-

ties that he had leaving his high school friends. His grades, although relatively poor, were improving prior to his departure. And reports from his teachers and counselors spoke of the progress that he was making during the first semester of his junior year. In light of those observations, the Court cannot say that the gap between achievement and grade level reflected the fact that he was receiving no educational benefit.

The Mathers also argue that the IEP did not include a language-based program fitted to Walter's needs. In particular, they rely upon the confidential letter sent in April, 1991, by Dr. Moats concerning the services provided by Ms. Berezin. Further, the Mathers rely upon the progress in grade level in reading accomplished by Walter during his eighteen months at Landmark.

In April 1991, Dr. Moats observed problems in the language instruction given by Ms. Berezin in the resource room. Based on Dr. Moats' recommendations, the School District enrolled Ms. Berezin in a number of workshops and a training program on the Orton–Gillingham method of teaching. As a result, Ms. Berezin's instruction of reading and written expression improved.

▇ Landmark School provided language-based instruction separate from the remainder of its curriculum. The IEP Team chose to attempt to incorporate language-based instruction into Walter's general curriculum. Ms. Berezin would use assignments in Walter's academic courses as the subject matter for his reading skills instruction. The Supreme Court in *Rowley* has instructed that courts do not have the expertise to determine which educational philosophy is more appropriate. *Rowley,* 458 U.S. at 206, 102 S.Ct. at 3050. The task of the court is to determine only if the system of instruction provides educational benefits. *Rowley,* 458 U.S. at 198, 102 S.Ct. at 3046.

Finally, in regard to the design of the IEP, the Mathers object to the omission of teaching skills which would permit independent learning, particularly reading, written expression and organizational skills. Various teachers testified at the due process hearing that Walter's skills in those areas had improved. Ms. Berezin confirmed Walter's

progress regarding those skills. The Court cannot find that Walter received no educational benefit regarding skill development in the areas of reading, written expression and organization.

▇ The Mathers' argument that Hartford High School teachers were unable or unwilling to accommodate Walter's unique educational needs is likewise misplaced. Walter's teachers participated in the many meetings regarding implementation of the IEP. They extended deadlines for papers and examinations in light of Walter's need for additional time for compliance with academic schedules. Walter needed three drafts of each essay, and educators were willing to assist in review of the papers and give him the additional time. Teachers offered to meet with Walter at any and all times for additional instruction to help him with his courses.

Despite the Mathers' assertion that the faculty refused to accommodate for Walter's disabilities, they also criticize the teachers and staff for over-compensating for those same difficulties. The Mathers assert that the work done with Walter in permitting tests to be done over and in helping him in second and third drafts of papers resulted in Walter being passed from grade to grade without having met the educational standards to go to the next level of high school. That kind of accommodation is what the IEP called for and appeared necessary in light of Walter's unique needs. Rather than reflect a desire of the teachers to pass him from grade to grade improperly, it speaks of the willingness of the staff to accommodate their level of instruction to fit their perceptions of his needs. The Court cannot say that the decision of the educators to accommodate in those particular ways is misplaced.

▇ The central issue before the Court is whether Walter's IEP and its implementation was reasonably calculated to provide and did so provide educational benefit to Walter. The District provided an integrated system of instruction with extensive communication among educators and consultants about the kind of program in Walter's best interest. The Court concludes based upon the follow-

ing reasons that the IEP was reasonably calculated to provide educational benefits and its implementation did comply with the IDEA:

(1) The Hearing Officer heard nine days of testimony during the course of the due process hearing and concluded that the IEP and the way it was being carried out by the Hartford School District followed the law. Under the *Rowley* decision, the Court is to give that determination due deference.

(2) Walter's disability was characterized as mild and subject to accommodation without major disruption of staff and programs.

(3) Teachers and staff members testified to the progress both in attitude and academics that Walter was experiencing prior to his departure.

(4) Ms. Berezin testified at the due process hearing that Walter made progress in written language and organizational skills over the last eighteen months at Hartford High School and that those months also marked an improvement in his sense of self-esteem and independence.

(5) The District made major efforts at employing experts who could advise them about the appropriate educational program for Walter. Those efforts included significant commitment of time and expense to assist Walter in his education. The District incorporated their recommendations as well as the findings of experts hired by the Mathers into the IEP.

(6) The District employed tutors during the summer months to assist Walter in his education and paid for a summer residential placement at Landmark School in 1992. Staff members observed Walter in the Landmark setting and invited Landmark teachers to participate in the IEP meetings to help them formulate and implement an IEP that met Walter's educational needs.

(7) Experts who observed Walter in the classroom setting and who had familiarity with his academic progress over the years, namely Dr. Louisa Cook Moats, concluded that his IEP was appropriate and that his needs could be and were being met within the school setting.

(8) Walter's attitude, sense of commitment and social and educational investment in the school had improved during his high school years which signifies a healthier sense of himself. That was a primary goal of the staff and consultants.

(9) Recent test scores done by Drs. Curran, Roche and Kemper revealed improvement in the areas of written expression and reading comprehension under timed circumstances, factors which Dr. Moats attributed to instruction and practice while at Hartford High School.

(10) Walter's teachers took a conscientious and active role in attending and participating in the IEP meetings and implementation of his program.

(11) Walter's rapid adjustment to Landmark School so that he was receiving top grades almost immediately supports the conclusion that preparatory instruction at Hartford High School helped him to be successful.

An intensive language-based residential program may or may not have been able to provide a better educational program than the kind of integrated approach implemented by Hartford High School. The IDEA does not require the District to provide the best possible program. It requires only that an IEP is developed which reasonably calculated to enable a child to receive educational benefit and that the child does receive such benefit. The evidence has clearly established that Walter's IEP was appropriate in light of the level of his disabilities and that he received significant educational benefit. As a result, the Court finds that the District did provide Walter with a free appropriate public education in compliance with the IDEA, the opinion of the Hearing Officer is hereby affirmed and that the Mather's request for reimbursement for Landmark tuition and expenses is DENIED.

Further, in light of these findings, the remaining counts of the Complaint appear to be without merit and subject to dismissal. The Court ORDERS that the Plaintiffs are given thirty days from the date of this Order

to show cause why the Complaint should not be dismissed.