**ST. JOHNSBURY ACADEMY, Plaintiff,**

v.

**D.H., St. Johnsbury School District, and State of Vermont, Department of Education, Defendants.**

No. 2:93–CV–398.

United States District Court,
D. Vermont.

Sept. 30, 1998.

---

Charles Norman Hurt, Jr., Downs, Rachlin & Martin, St. Johnsbury, VT, Robert Berry Luce, Downs, Rachlin & Martin, P.C., Burlington, VT, for St. Johnsbury Academy.

Judith Foldes Dickson, Vermont Developmental Disabilities Law Project, Burlington, VT, Eileen Morris Blackwood, Blackwood and Kraynak, Burlington, VT, for D.H.

Edward Richard Zuccaro, Judith Anne Salamandra Corso, Zuccaro, Willis & Bent, P.C., St. Johnsbury, VT, for St. Johnsbury School Dist.

Paul Carl Fassler, Vermont Department of Education, Montpelier, VT, for Vermont, State of, Department of Education.

## OPINION AND ORDER

SESSIONS, District Judge.

This action arose as an appeal of an administrative hearing officer's decision under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400. Plaintiff St. Johnsbury Academy ("the Academy") appealed pursuant to 20 U.S.C. § 1415(i)(2) from a due process hearing initiated by D.H. against the Academy, the St. Johnsbury School District ("the District"), and the State of Vermont Department of Education ("the Department"). After receiving additional evidence at trial, on July 10, 1996, the Court determined that D.H.'s placement in the regular classroom at the Academy was in accordance with the provisions of IDEA. This opinion

addresses whether the Academy's fifth-grade achievement standard for placement in the mainstream classroom is discriminatory against D.H. or in general, in violation of IDEA or Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 ("Section 504"). For the following reasons, the Court finds that the fifth-grade criteria violates IDEA and Section 504 both as applied to D.H. and generally.

## I. *Factual Background*

D.H. is a twenty-year old student with multiple disabilities who is eligible for special education and related services pursuant to IDEA. Under IDEA, D.H. is entitled to a free appropriate public education ("FAPE"), in accordance with an Individualized Education Program ("IEP") created by a team of interested parties. D.H. resides with his surrogate parent in St. Johnsbury; in 1993 he completed the eighth grade at St. Johnsbury Middle School, where he was mainstreamed.

During that year D.H. applied for admission to the Academy. St. Johnsbury has no high school; the District offers tuition for its students to attend other schools. The District pays tuition to the Academy for the students enrolled there. The vast majority of students residing in St. Johnsbury attend the Academy. Historically, the Academy has served as the secondary school for St. Johnsbury residents. Evidence at trial indicated that during the 1992–93 school year, 378 out of 397 secondary students from the District were schooled at the Academy.

The Academy is an approved independent school, meaning it is permitted to accept students whose tuition comes from public funds. Board of Education, State of Vermont, Manual of Rules and Practices, Rule 2224.1. The Academy also has received special school approval from the Department, allowing it to accept publicly-funded tuition for special education students. Rule 2224.2 An independent school may obtain special school approval if it "meet[s] standards that apply to state and local education agencies." Rule 2228.3.

The Academy divides its special education services into a Resource Room Program and an Individualized Services Program. Students in the latter program are taught in a segregated classroom along with other individuals with disabilities and may be mainstreamed for non-academic activities. The Resource Room Program allows for students to be placed in regular academic classes. Among the requirements for admission to the Resource Room Program are performance at the fifth-grade level in reading, writing, or mathematics.

The Academy denied D.H.'s application because his IEP called for him to be included in mainstream classes for English and Social Studies. D.H. was not admitted to the Resource Room Program because he could not demonstrate a fifth-grade level as measured by standardized testing, classroom performance, teacher recommendations, and other factors. D.H. has no standardized test scores because his disability prevents a meaningful evaluation through that method. The Academy offered to accept D.H. into the Individualized Services Program if his IEP were changed to remove the mainstreaming recommendation. The Academy, though invited, did not participate on the IEP team.

D.H.'s parent filed a due process action against the Academy and the District in the summer of 1993. The Department subsequently intervened. On November 23, 1993, the administrative hearing officer found in favor of D.H. and his parent, ruling that D.H.'s IEP, including mainstreaming, could be fulfilled at the Academy. The Academy appealed that decision to this Court. D.H. filed a counterclaim against the Academy and a crossclaim against the District, charging violations under various laws including IDEA and Section 504. The District filed a cross and counter complaint against the other three parties.

This Court granted an injunction in 1994 which has remained in effect, ordering the Academy to admit D.H. and provide services in accordance with his IEP. In 1995 the Department accepted conditionally the Academy's application to renew its status as a special school. The Department expressed its concern over the categorical nature of the Academy's special education services, and

stated its understanding that student placement would be guided by individual needs rather than institutional structure.

This Court in 1995 dismissed one of D.H.'s state law claims, adopting the Magistrate Judge's Report and Recommendation (Papers 52 and 54). In that report the "unusual circumstances surrounding the Academy's relationship with public schools" led the Magistrate Judge to find the Academy "a 'hybrid' sort of non-public and public school." (Paper 52 at 2.) At the close of the trial in 1996, this Court reaffirmed its adoption of that characterization.

The Court at that time also expressed its intention to deny the Academy's appeal. The Court reserved judgment on the issues of whether the Academy's fifth-grade placement criterion was discriminatory as applied to D.H. and whether it was discriminatory in general, in violation of IDEA and Section 504.

In November 1997, the Academy filed a motion to dismiss the case as moot. (Paper 77.) This motion surfaced in reaction to a decision made by the IEP team to remove D.H. from his two mainstream classes.

According to D.H.'s surrogate parent, Linda Ladd, this modification occurred because of a new vocational proposal. The IEP team determined that there was not enough time for the new vocational work, the two classes, and D.H.'s other activities. Ladd only agreed to the new schedule because of the scheduling problem. Ladd also noted that if there were delays in implementing the vocational program, if D.H. needed less time for the program than was thought, or if the program was not appropriate, she would request that D.H. be returned to the mainstream English and Social Studies classes. Ladd aimed to have D.H. remain in school on an IEP as long as he is eligible, until age twenty-two, and she planned to request mainstream academic placement for D.H. in future years.

## II. Discussion

### A. IDEA

The enactment of IDEA,[1] 20 U.S.C. §§ 1400–1491, represented "an ambitious federal effort to promote the education of handicapped children." *Walczak v. Florida Union Free School District*, 142 F.3d 119, 122 (2d Cir.1998) (quoting *Board of Educ. v. Rowley*, 458 U.S. 176, 179, 102 S.Ct. 3034, 73 L.Ed.2d 690 (1982)). IDEA creates "a comprehensive scheme designed to help states meet the educational needs of children with disabilities." *Briere v. Fair Haven Grade School District*, 948 F.Supp. 1242, 1250 (D.Vt.1996). Under this scheme, children with disabilities are entitled to a free appropriate public education ("FAPE"), including special education and related services. 20 U.S.C. § 1412(a)(1). States receive federal funds for developing plans to ensure that a FAPE is provided to their disabled children. *Walczak*, 142 F.3d at 122.

This law stresses that, "to the maximum extent appropriate," children with disabilities should be "educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A). That is, disabled students are to be educated in the least restrictive environment ("LRE") possible, whether they are in private or public schools. *Id.* Students should only be removed from the regular classroom if "the nature or severity" of their disabilities prevents their education in that classroom, "with the use of supplementary aids and services," from being "achieved satisfactorily." *Id.*

Each student with disabilities is the subject of an IEP, to establish the student's particular needs and the services required to meet those needs. 20 U.S.C. §§ 1412(a)(4), 1414(d). The IEP is composed by a group, the IEP team, consisting of the child's parents, teachers, local educational officials, individuals who can interpret the student's evaluations, and others with special knowledge or expertise regarding the child. 20 U.S.C. § 1414(d)(1)(B). The IEP is reviewed at least once annually. 20 U.S.C. § 1414(d)(4)(A).

---

1. This statute before 1990 was known as the Education of the Handicapped Act or the Education for All Handicapped Children Act.

IDEA delegates general responsibility for compliance with its requirements to the state educational agency ("SEA"), in this case the Department. 20 U.S.C. § 1412(a)(11)(A). A local educational agency ("LEA") may receive federal funds if it provides a FAPE at the local level consistent with IDEA's requirements. 20 U.S.C. § 1413(a)(1).

Parents who are dissatisfied with their child's placement or IEP may obtain an impartial due process hearing, to be conducted by the SEA or the local educational agency. 20 U.S.C. § 1415(f)(1). State law provides that parents desiring a due process hearing may bring an action against the SEA, an intermediate educational agency ("IEA"), or the LEA. Vt. Stat. Ann. tit. 16, § 2957(a). Any party may appeal the administrative findings by filing a civil action in state or federal court. 20 U.S.C. § 1415(i)(2)(A).

### B. *Motion to Dismiss*

Plaintiff contends that D.H.'s current placement, since it was assented to by all parties, renders this case moot. Defendants disagree, noting that the uncertainty of the new program and Ladd's continuing desire to enroll D.H. in mainstream classes could reignite the dispute over the fifth-grade standard.

■ The mootness doctrine derives from the case or controversy requirement of Article III of the Constitution. *Fox v. Board of Trustees of State Univ. of N.Y.,* 42 F.3d 135, 139–40 (2d Cir.1994). Mootness deprives federal courts of subject matter jurisdiction when the parties no longer hold a legally cognizable interest in the outcome. A plaintiff must have a personal stake in the litigation for it to survive. *Id.* at 140.

■ An exception to mootness exists for claims that are capable of repetition, yet evading review. This exception applies given the fulfillment of two elements: "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Murphy v. Hunt,* 455 U.S. 478, 482, 102 S.Ct. 1181, 71 L.Ed.2d 353 (1981) (*per curiam*)

(quoting *Weinstein v. Bradford,* 423 U.S. 147, 149, 96 S.Ct. 347, 46 L.Ed.2d 350 (1975) (*per curiam*)). The second prong requires not just "a mere physical or theoretical possibility" but "a reasonable expectation or a demonstrated possibility" that the same controversy involving the plaintiff will arise again. *Id.* (citations omitted).

■ Though presently all parties endorse D.H.'s new placement, this contest is by no means moot. An IDEA claim does not become moot simply because the contested placement is halted. Such cases have been dismissed for mootness only in particular circumstances, such as when the challenged school policy has been altered, or when a challenged placement has been changed with the parents' consent and a return to the former placement is unlikely. *See Greene v. Harrisville Sch. Dist.,* 771 F.Supp. 1 (D.N.H. 1990); *Christopher P. v. Marcus,* 915 F.2d 794 (2d Cir.1990).

■ By contrast, an IDEA case is not moot when a court perceives "the possibility that the school districts would continue specific policies which plaintiffs claimed were both offensive to [IDEA] and harmful to them." *Greene,* 771 F.Supp. at 5. For instance, the Fifth Circuit found an IDEA case capable of repetition yet evading review where the plaintiff had a new IEP and no longer attended public school, but the school district had not changed its policy against mainstreaming those it believed would not benefit academically. *See Daniel R.R. v. State Board of Education, El Paso Independent School District,* 874 F.2d 1036 (5th Cir. 1989). That policy was likely to be an issue whenever a new placement or IEP was discussed. *Id.* at 1040–41.

■ This exception to mootness only protects the claims of those who still qualify for IDEA's protections. *Honig v. Doe,* 484 U.S. 305, 318–20, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (plaintiff's claim survived where contested policy persisted, plaintiff was still of qualifying age, and plaintiff still resided in California). *See also Heldman v. Sobol,* 962 F.2d 148, 157 (2d Cir.1992) (though student had withdrawn from school and no IEP review was pending, same dispute could resur-

face as student was nineteen years old and had not yet completed high school). Older students particularly warrant protection; since review under IDEA can be ponderous, a new claim may evade review if the student becomes too old to obtain relief under the Act. *Honig*, 484 U.S. at 322–23, 108 S.Ct. 592.

■ In this case, D.H. is still an enrolled student at the Academy. He is now twenty and according to Ladd will remain in school at least for another year. Ladd intends to seek placement for D.H. in the regular classroom. The IEP team removed mainstream classes solely because of his schedule. Ladd could request an IEP review at any time, and the Academy's fifth-grade standard remains in place. This litigation is therefore capable of repetition. A new claim by D.H. may evade review, given the length of this initial proceeding and D.H.'s age. As a result this case is excepted from the mootness doctrine, and Plaintiff's motion to dismiss must be denied.

### C. *Regulation of the Academy*

The Academy reasserts its position that because it is not an LEA, IEA, or SEA, it cannot be a proper party to an IDEA action. The Academy also contends that special school status does not compel it to satisfy all state and federal laws governing students with disabilities. These arguments revolve around the characterization of the Academy as private, a description which according to the Academy insulates it from compliance with the regulations at issue.

The Academy is a privately operated school. Historically the Academy served as the secondary education institution for the town of St. Johnsbury, before public education. Today, the District pays tuition to the Academy for the enrollment of students from St. Johnsbury. As a certified independent school the Academy accepts students whose tuition comes from public sources, and as a special school it is qualified to educate students with disabilities. Over ninety percent of the town's high school students at-

tend the Academy, comprising a substantial percentage of the school's student body. The Academy for all intents and purposes functions as the public high school for St. Johnsbury residents.

■ The Magistrate Judge found the Academy to be neither public nor private but a "hybrid" institution. (Paper 52 at 2.) That conclusion, which this Court adopted, is not ambiguous but apt. The Academy exhibits the markings of both a private and a public school. As the provider for virtually all the District's secondary students, the Academy shares with the District the attributes and responsibilities of an LEA.

Such circumstances, while complex, are not unique. A black and white delineation of that which is public and that which is private is no longer easily attained. These categories have been blurred in our society; government involvement in the private sector has expanded substantially, while private entities assume functions formerly perceived as public.[2] The relevance of the rigid public/private distinction has diminished.

The Academy perceives an effort to convert it from a fully private into a fully public school. To the contrary, this Court has concluded that the Academy occupies neither extreme, but a position along the spectrum between public and private. While the Academy may be called a private school for convenience, that name does not signify its total detachment from the public sector or from public regulation.

Many private schools offer diversity from public schools. Subject to fewer regulations than their public counterparts, private schools may be more flexible to vary their programs. The Academy points out that were all schools to be governed by an identical set of regulations, institutions offering alternatives to the regular classroom would not exist.

However, private institutions often pose a greater risk of harming others because of reduced governmental oversight. This pos-

---

**2.** *See, e.g.,* Clayton P. Gillette, *Opting Out of Public Provision,* 73 Denv.U.L.Rev. 1185, 1186 (1996) ("the absence of a clear public/private distinction has been the source of substantial commentary suggesting both that government might engage in heretofore 'private' activities and that markets might invade the previously 'public' realm").

sibility surfaces when considering the privatization of any public service; the private entity may produce more efficient or cost-effective results by avoiding responsibilities required of public entities. Even private entities are subject to public laws, then, when the public interest being protected is strong enough. As a result hybrid entities arise, performing public services but bound to adhere to certain regulations.

■ The Academy is just such an institution. One would look there to find the regular academic classroom of St. Johnsbury's secondary students. Therefore one would also look there to implement the mainstreaming of St. Johnsbury's students with disabilities. As an approved independent and special school, the Academy is subject to certain state and federal regulations. Regardless of that status, the Academy's unique position means that it acts essentially as the LEA for the purpose of laws governing the education of students with disabilities. Given the importance of the rights of these students as protected by IDEA and Section 504, the Academy must follow the standards set out by those laws.

In this case, Defendants do not attempt to force a private school to construct a special education program it does not offer. Rather, they seek recognition that the Academy acts as an LEA; they wish to open the regular classroom of a town's secondary students to a classmate with disabilities. The facts of this case compel the Court to conclude that the Academy is subject to state and federal laws regarding the education of disabled children. The two specific issues raised by the Academy are treated below.

### 1. *Proper Parties to the IDEA*

The Academy resubmits its argument that it is not a proper party to an IDEA action. The school argues that IDEA intends to ensure a single line of responsibility for compliance. Under the statute, the SEA must assure that all requirements are met, regardless of which state or local agencies are involved. 20 U.S.C. § 1412(a)(1)(A). The SEA also oversees the services provided in private schools, to ensure that those schools meet the standards applicable to public schools and LEAs. 20 U.S.C.

§ 1412(a)(10)(B). These provisions were constructed with the acknowledgment that a variety of agencies often participate in the education of those with disabilities. Congress believed that "responsibility must remain in a central agency ... so that failure to deliver services or the violation of the rights of handicapped children is squarely the responsibility of one agency." S.Rep. No. 94–168, 1st Sess., at 24 (1975), *reprinted in* 1975 U.S.C.C.A.N. at 1448.

In Vermont the LEA is also responsible for providing FAPE to students with disabilities. The Academy points out that Vermont law calls for due process actions to be brought against the SEA, IEA, or LEA, Vt.Stat.Ann. tit. 16, § 2957(a), and alleges that it is thus prohibited from involvement as a party in this proceeding.

The Court's ruling that the Academy is an LEA for the purposes of IDEA refutes this notion. In addition, the provisions delegating ultimate responsibility under IDEA do not expressly exclude other agencies from IDEA due process proceedings. In fact, the same IDEA subsection that accords responsibility to the SEA also declines to limit the responsibility of other agencies from providing or funding a FAPE. 20 U.S.C. § 1412(a)(11)(B).

The Academy cites three cases in which other state and federal courts declined to join certain parties to the IDEA action. The facts of the instant case, however, differ from these cases. In *Johnson v. Independent Sch. Dist. No. 4 of Bixby, Tulsa County, Oklahoma*, 921 F.2d 1022 (10th Cir.1990), *L.P. v. Edison Bd. of Educ.*, 265 N.J.Super. 266, 626 A.2d 473 (N.J.Super.Ct.Law Div.1993), and *Nevada County Office of Educ. v. Superintendent of Public Instruction*, 149 Cal.App.3d 767, 197 Cal.Rptr. 152 (Cal.Ct.App.1983), a school or state agency found not to be the SEA or LEA was found not to be a necessary party to a due process hearing, as primary responsibility for the provision of FAPE rested with the state or local educational agencies. The cases spoke to whether the agencies were necessary, not permissive, parties.

In none of these decisions were the proposed parties as central to the cause of action as the Academy, which has been found to possess LEA responsibilities in this case. Especially in *L.P.* and *Nevada County*, the outside party was being joined to determine which agencies would fund the student's education, an issue the reviewing courts found too far removed from the purpose behind due process hearings under IDEA. Here, the issue involving the Academy is closely tied to the student's IEP and its implementation.

### 2. The Academy's Obligations Under State and Federal Laws Governing the Education of Students With Disabilities

The Academy believes that the parameters of its application for special school approval limit the school's obligation under state and federal laws addressing special education. The application outlines the Individualized Services Program and the Resource Room Program, and the school envisions that it may not be the appropriate placement for all students with disabilities. By accepting the application, the Academy contends, the Department concurred that the Academy would only be required to offer programs which it intended to and was equipped to offer.

■ As for approval of the application, the Department only accepted it with reservations about categorical placements. The Department believed that this lack of flexibility ran counter to the requirement of an IEP for each disabled student. The approval came in 1995, during the pendency of this action challenging the fifth-grade standard, so the Department's approval of the Academy's application was contingent on this Court's ruling.

■ As a special school the Academy cannot avoid compliance with federal and state law regarding individualized plans and mainstreaming. According to the federal Office of Special Education Programs ("OSEP"), special school status does not render private schools subject to all public school regulation. Office of Special Education Programs, Department of Education, *Letter to Reedy*, 16 EHLR 1364 (1990). IDEA requirements only govern those facets of private schools that affect publicly placed children. *Id.*

Since the SEA and LEA are ultimately responsible for meeting the requirements of IDEA, if a private school is unwilling or unable to fulfill the tasks necessary to provide a FAPE to a student, these agencies generally look to place that student elsewhere. The Academy is asked to mainstream a student in two classes without substantially altering the course curricula; the school cannot persuasively argue its inability to provide that service.

Moreover, Vermont regulations require that special school applicants meet the standards applicable to LEAs and the SEA. Manual of Rules and Practices, Rule 2228.3. Such standards include IDEA's LRE requirement and its express preference for mainstreaming, a central component of the law. By obtaining special school approval, the Academy agrees to abide by those standards, at least with regard to the parts of the school involving publicly placed students.

The regular classroom is not normally viewed as a facet of a private school affecting publicly placed children. In this circumstance, however, the regular classroom is the site of mainstreaming which has been prescribed by the IEP. Therefore, state and federal laws governing the education of students with disabilities apply to this special school, and the Academy must follow them.

### D. Propriety of the Fifth–Grade Achievement Level

#### 1. IDEA

##### a. Standard of Review

On appeal from an administrative due process hearing pursuant to IDEA, "the court shall receive the records of the administrative proceedings; ... shall hear additional evidence at the request of a party; and ... basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(B).

■ The reviewing court should acknowledge the expertise of the state and local agencies in creating educational programs

for the handicapped. *Briggs v. Board of Educ. of the State of Connecticut*, 882 F.2d 688, 693 (2d Cir.1989) (citing *Rowley*, 458 U.S. at 207–08, 102 S.Ct. 3034). Therefore the court must not substitute its judgment for that of school authorities. *Mather v. Hartford School Dist.*, 928 F.Supp. 437, 445 (D.Vt.1996) (citing *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034). Due weight is to be accorded the state administrative proceedings. *Rowley*, 458 U.S. at 206, 102 S.Ct. 3034.

■■■ The Second Circuit has not ruled on where the burden of proof falls in an appeal of an IDEA due process hearing. Generally, other circuits give the burden to the party challenging the administrative ruling. *See Wall v. Mattituck–Cutchogue School Dist.*, 945 F.Supp. 501, 509 (E.D.N.Y.1996) (citing cases). The Third Circuit disagrees, holding that the burden of proof should always be issued to the school district. *See Oberti v. Board of Educ.*, 995 F.2d 1204, 1219 (3d Cir.1993). Here, the Academy is the party challenging the administrative decision and the IEP. In addition, the Academy serves as the LEA for the purposes of this case. Under either standard, the Academy should carry the burden of proof. *See Sacramento City Unified Sch. Dist., Bd. of Educ. v. Rachel H.*, 14 F.3d 1398, 1403 (9th Cir.1994) (since party challenging decision was the school district, district had burden of proof).

■■■ Regardless of its location, the burden of proof is not of terrific concern. IDEA's standards of review ultimately require the court to make an independent determination based on a preponderance of the evidence, giving due weight to the proceedings below. *Mr. X v. New York State Educ. Dept.*, 975 F.Supp. 546, 554–55 (S.D.N.Y. 1997). Such specific guidance as to how a determination should be made lessens the impact of the burden of proof on the decision.

### b. *Compliance with IDEA*

■■■ The Supreme Court has issued a test for evaluating actions pursuant to 20 U.S.C. § 1415(i)(2). *Rowley*, 458 U.S. at 206–07, 102 S.Ct. 3034. First, the court determines whether the procedures of IDEA have been followed. *Id.* at 206, 102 S.Ct. 3034. Second, the court should inspect the IEP and decide whether that plan is reasonably calculated to enable the handicapped student to receive educational benefit. *Id.* at 207, 102 S.Ct. 3034. This test is less useful where the issue on appeal is the propriety of mainstreaming rather than the adequacy of the IEP. *See Mavis v. Sobol*, 839 F.Supp. 968, 982 (N.D.N.Y.1993).

■■■ However, IDEA's call for a meaningful educational benefit must be remembered when a placement is contested. *See Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir.1997). The placement offered must be appropriate, so that the student will more likely progress than regress. *Walczak*, 142 F.3d at 130. The benefit must be more than a trivial one. *See Evans v. Board of Educ. of the Rhinebeck Central Sch. Dist.*, 930 F.Supp. 83, 100–01 (S.D.N.Y.1996) (IDEA does not permit States to make mere token gestures to accommodate the handicapped). At the same time, IDEA does not entitle the handicapped student to the best education possible, *Mather*, 928 F.Supp. at 445, and no specific level of education is mandated by the law. *Walczak*, 142 F.3d at 130.

■■■ The quest for a meaningful educational benefit coexists with IDEA's emphasis on the least restrictive environment, and particularly mainstreaming. *See Mather*, 928 F.Supp. at 445–46; *Briggs*, 882 F.2d at 692. This case concerns whether IDEA's endorsement of mainstreaming renders the Academy's proposed segregation of D.H. inappropriate. *See Briggs*, 882 F.2d at 692. Objective evidence, such as passing grades and regular advancement in a mainstream setting, assist the independent review of the propriety of the program, *Walczak*, 142 F.3d at 130, but the limitations of the student given his or her disability must be considered. *Mrs. B.*, 103 F.3d at 1121. Progress should be measured not by nondisabled standards, but in terms of the disabled student's own abilities. *Mavis*, 839 F.Supp. at 988. Mainstreaming is the norm and only should be forgone if education in regular classes cannot be achieved satisfactorily. *Mather*, 928 F.Supp. at 446 (citing *Briggs*, 882 F.2d at 692).

Two approaches have been proposed for evaluating mainstream placements, in place of the general *Rowley* test. Under the *Roncker* model, the court viewing a student in a segregated setting asks whether, given supplementary aids and services, the student's education could be feasibly duplicated in the regular classroom. *See Roncker v. Walter*, 700 F.2d 1058, 1063 (6th Cir.1983); *Mather*, 928 F.Supp. at 446. Other courts have followed the *Daniel R.R.* test, which first asks whether education in the classroom, with the use of supplementary aids and services, may be achieved satisfactorily. If the response is negative and the student must be segregated, the court asks whether the school has mainstreamed the student to the maximum extent appropriate. *Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1048 (5th Cir.1989). Other considerations that have been listed include the effects of inclusion on the other students in the classroom and the costs of mainstreaming. *See Daniel R.R.*, 874 F.2d at 1049–50; *Sacramento City*, 14 F.3d at 1404.

This Court has in the past used the *Roncker* test, *see Mather*, 928 F.Supp. at 446. The *Daniel R.R.* test would be appropriate here as well, however. The debate lies primarily in the feasibility of education in the regular classroom, a consideration covered by both tests. The terms of either test are broad enough to include the various other factors which have been considered in such cases.

■■ Regardless of which test is followed, the mainstream placement is appropriate. Under *Roncker* or the first step of *Daniel R.R.*, it is clear that D.H. could be educated satisfactorily in the regular classroom. D.H. has reaped the benefits of mainstreaming in the past and may do so again in the future. The Court recognizes that the same conclusion was reached by those with more expertise in this field. In 1993 the IEP team (without the Academy, which was invited but did not participate) came to agree that D.H. should be mainstreamed for English and Social Studies. The administrative hearing officer also approved of mainstreaming, and this Court accords due weight to that proceeding.

D.H. participated in the regular classroom prior to high school and has reaped the benefits of mainstreaming, according to his middle school teachers. No allegation has been substantiated that D.H.'s presence will be an intrusion on the rest of the class, or that it will lead to added expense for the Academy.

Instead, the Academy opposes mainstreaming because D.H. fails to meet a fifth-grade achievement level, as defined by the school. According to the Academy, D.H. should not be mainstreamed because failure to meet this standard will translate into no academic benefit for him in those classes, under the school's curriculum.

■■ The purpose behind mainstreaming involves more than simple academic issues. *Mavis*, 839 F.Supp. at 990. Educational benefit should not be mistakenly equated with academic benefit alone. *See Daniel R.R. v. State Bd. of Educ.*, 874 F.2d 1036, 1047, 1047 n. 8 (5th Cir.1989). Integration into the regular classroom holds many benefits, including that of providing social, language, and behavioral models for the student with disabilities, that should not go unnoticed. *Id.* at 1047–48. IDEA accepts the possibility that students with disabilities will participate in the regular classroom but will not benefit as much as their nonhandicapped classmates. *Id.* at 1047.

D.H. is achieving meaningful educational benefit in the regular classroom. This student's participation in two classes with his nondisabled peers results in academic gains, as well as invaluable social and behavioral benefits. *See Mather*, 928 F.Supp. at 446 (educational benefit can be shown through "a wide number of considerations," including "[g]rades, socialization skills, level of participation, consistency of effort and commitment to studies"). These are not trivial benefits; they are not the makeweights of a school district in search of a cheap means of complying with IDEA, but the agreed-upon goals of D.H.'s parent and the IEP team.

The Academy's fifth-grade achievement requirement is an inadequate measure of an individual's educational benefit. In addition, this criterion primarily considers standardized test scores. D.H. cannot hope to meet the standards designed for the nondisabled. The value of mainstreaming vastly outweighs

the relevance or importance of this fifth-grade achievement requirement.

The importance of mainstreaming under IDEA, the considered findings of the administrative hearing officer and the IEP team, and the inadequacies of the fifth-grade achievement standard all move this Court to find that D.H.'s placement in the Academy's regular classrooms for two classes has been and would be correct.

■ In addition, the fifth-grade achievement level is discriminatory in general and contrary to the mission of IDEA. A decision as to the educational program of students with disabilities is not fair if it takes into account nondisabled standards. This requirement attempts to measure disabled students with a standard designed for the non-disabled.

This single bar to entry into the regular classroom also defies the balancing that must occur under IDEA between mainstreaming and achieving educational benefit. The fifth-grade standard does not permit adequate balancing as to the particular individual. On a similar note, IDEA ensures the development of an IEP particular to each student with disabilities. The IEP structure calls for individualized programming based on each student's circumstances. The drawing of a single line to determine a student's program, based on an arbitrary grade level standard, conflicts with this scheme.

It must be remembered that IDEA was enacted more to open the door for disabled students to public education than to reach a particular level of education. *Rowley*, 458 U.S. at 192, 102 S.Ct. 3034. In addition, the Academy's defense of this standard "presupposes that evaluations based upon grade levels are determinative of educational progress, an assumption the Court is unwilling to make." *Mather*, 928 F.Supp. at 446. The fifth-grade achievement standard violates generally the intent and spirit of IDEA.

### 2. *Compliance with Section 504*

■ Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794, prevents discrimination by recipients of federal funds. Under this statute, no otherwise qualified individual with a disability shall be excluded from par-ticipation or denied the benefits of any program or activity that receives federal funds, solely because of his or her disability. *Id.* This statute in particular targets a few substantive areas, one of which is education. *Alexander v. Choate*, 469 U.S. 287, 306–07, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985).

■ The regulations pertaining to education under the Rehabilitation Act resemble those under IDEA. Recipients must place students with disabilities in the least restrictive environment. 34 C.F.R. § 104.34(a). Individualized decisions as to a disabled student's education are to be made by a group including those who are knowledgeable about the student, the student's evaluations, and the available placement options. 34 C.F.R. § 104.35(c)(3). The group should draw on a variety of sources in reaching its decision. *Id.* Segregating a student from the regular classroom without an individual determination as to the appropriateness of some degree of mainstreaming constitutes a violation of Section 504. *See Montgomery County (MD) Pub. Sch.*, 19 IDELR 43 (OCR 1992). A student may not receive a placement because of a blanket policy or administrative convenience. *See Peru (N.Y.) Cent. Sch. Dist.*, 16 EHLR 514 (OCR 1989).

■ Private schools that receive federal funds are subject to the requirements of Section 504. Such schools may not exclude a student on the basis of his or her handicap "if the person can, with minor adjustments, be provided an appropriate education . . . within the recipient's program." 34 C.F.R. § 104.39.

■ Before turning to the Academy's compliance with Section 504, a prima facie claim must be established. A Section 504 claim exists if (1) the Academy is a recipient of federal funds; (2) D.H. has a disability; (3) D.H. is otherwise qualified to receive a FAPE in the least restrictive environment; and (4) he is being excluded from participation because of his disability. *Mrs. C. v. Wheaton*, 916 F.2d 69, 74 (2d Cir.1990). The Academy does not dispute the existence of a prima facie case.

Rather, the Academy challenges the validity of the Section 504 claim, alleging that achievement grouping is nondiscriminatory and that substantial adjustments would be required in order to waive the fifth-grade standard. The Academy submits that by establishing the Individualized Services and Resource Room programs it has made the minor adjustments necessary to comply with the Rehabilitation Act. In addition, the Academy asserts that its entire curriculum is designed to permit academic benefit to students of a fifth-grade level or higher, so that any deviation from this standard would disrupt the curriculum.

The Court finds that the fifth-grade achievement requirement discriminates against D.H. based on his disability, and that D.H. can be mainstreamed in classes with minor adjustments. Placing D.H. in the regular classroom does not destroy the Academy's system of achievement grouping; it simply acknowledges that a student's special education program must take into account a variety of considerations. No dilution of the curriculum is required, as D.H. attends these classes for the overall educational benefit. The only adjustments involve allowing D.H. to attend and to participate when he is able, and asking D.H. the occasional question. These adjustments are truly minor, especially in light of the mandate to mainstream where appropriate. This mandate and the regulations calling for individualized special education planning are improperly hindered by the fifth-grade standard as applied to D.H. That standard discriminates against D.H. in violation of Section 504.

The fifth-grade requirement also runs afoul of Section 504 in general. Though nondiscriminatory on its face, this standard effectively filters out only those whose disabilities prevent them from attaining the necessary mark. A categorical bar such as this one cannot be reconciled with the multi-factored, individualized decisions that are necessary to fulfill Section 504's guarantee of an appropriate education. A fifth-grade achievement barrier, as defined in large part by standardized test scores, excludes the disabled on the basis of their disabilities and prevents their education in the least restrictive environment. This blanket policy for placement discriminates against students with disabilities. As a result the fifth-grade achievement requirement violates generally the language and implementing regulations of Section 504.

### III. Conclusion

The Academy relies on its private school status to defend its fifth-grade achievement standard. This standard is alleged to be nondiscriminatory and essential to the school's curriculum, and a permissible requirement for a private school to use in placement of students with disabilities.

The Court disagrees with the Academy's assessment of its own character and that of its fifth-grade standard. The Academy is an approved independent and special school, subject to the laws governing the education of students with disabilities. Moreover, as the educational provider to virtually all St. Johnsbury high school students, whose tuitions are paid for by the Town, the Academy is a hybrid institution with significant public characteristics to match its private traits. The school, though not a creation of the District, functions as the LEA and thus must fulfill an LEA's obligations.

Those obligations include the duties set forth in IDEA and Section 504. The Academy must ensure that a FAPE is provided to its special education students. To the maximum extent appropriate, these students should be educated in the classroom with the nondisabled. Their schooling should take place in accordance with an IEP which has been designed specifically to address each student's disabilities and needs. So long as the Academy accepts special education students and receives federal funds, it is bound by these requirements of IDEA and Section 504.

The provisions of those statutes do not permit the imposition of a categorical standard for the mainstream placement of students. Though dubbed achievement grouping by the Academy, the fifth-grade standard does little more than exclude those whose disabilities prevent them from reaching that level or even from being fairly evaluated.

This minimum mark does not aid the Academy in dividing its students into various classes distinguished by their difficulty. The fifth-grade standard acts as a blanket policy barring certain disabled students from entry into the mainstream classroom, in spite of federal and state laws which prize mainstreaming and individualized placement decisions.

The Court finds that the Academy's fifth-grade achievement standard violates IDEA and Section 504. D.H.'s request for a permanent injunction enjoining the Academy from using this standard is hereby GRANTED. Since D.H. has been able to attend mainstreamed classes, compensatory damages are DENIED.

Since D.H. was a prevailing party, he is entitled to reimbursement of reasonable attorney's fees and costs. If the parties cannot agree upon such fees and costs, either party may petition the Court for resolution of the fees and costs. Final judgment is entered as of the date of this opinion.