**ST. JOHNSBURY ACADEMY, Plaintiff–Counterclaim–Defendant–Appellant,**

v.

**D.H., Defendant–Counterclaimant–Cross–Claimant–Appellee,**

**St. Johnsbury School District, Defendant–Cross–Defendant–Appellee,**

**State of Vermont, Department of Education, Defendant–Appellee.**

**No. 99–9512.**

United States Court of Appeals, Second Circuit.

Argued Sept. 28, 2000.

Decided Feb. 15, 2001.

Charles N. Hurt, Jr., Downs, Rachlin & Martin, St. Johnsbury, VT, for Plaintiff–Counterclaim–defendant–Appellant.

Eileen M. Blackwood, Blackwood Associates, P.C., Burlington, VT (Stacey F. Joroff, Vermont Legal Aid, Inc., St. Johnsbury, VT, on the brief), for Defendant–Counterclaimant–Cross–Claimant–Appellee D.H.

Edward R. Zuccaro, Zuccaro, Willis & Bent, St. Johnsbury, VT, for Defendant–Cross–Defendant–Appellee St. Johnsbury School District.

Geoffrey A. Yudien, Special Assistant Attorney General, State of Vermont Department of Education (William H. Sorrell, Attorney General, Montpelier, VT, on the brief), for Defendant–Appellee State of Vermont, Department of Education.

David D. Wilson, Dorset, VT, for Amicus Curiae Vermont Independent Schools Association.

Before McLAUGHLIN, JACOBS, and STRAUB, Circuit Judges.

JACOBS, Circuit Judge:

The St. Johnsbury School District ("the District"), which has no public high school, pays tuition for local students to attend either the St. Johnsbury Academy ("the Academy"), a private high school located in the town, or certain high schools outside the District. This case arose after the Academy refused to assign a disabled town resident to the Academy's mainstream, ninth grade academic classes because he did not meet the Academy's requirement that students in such classes perform at or above the fifth grade level. The Academy appeals from a permanent injunction entered by the United States District Court for the District of Vermont (Sessions, *J.*), under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400–1490,[1] and § 504(a) of the Rehabilitation Act of 1973, 29 U.S.C. § 794(a), invalidating the Academy's fifth grade minimum requirement for mainstream assignment.

The student, D.H., initially contested the fifth grade requirement in a challenge lodged with a state administrative hearing officer, who ruled in D.H.'s favor under IDEA and the Rehabilitation Act. The Academy properly pursued an appeal from that ruling to the District of Vermont naming as defendants D.H., the District, and the Vermont Department of Education

---

1. In 1997, IDEA was "completely revised" and its sections renumbered. 20 U.S.C.A., Chapter 33, History Note at 9 (West 2000). All relevant portions of the new law went into effect on July 1, 1998, three months before the district court entered the permanent injunction. *See id.* at 10. We refer to the current version of IDEA, except when otherwise noted.

("the VDE"). *See* 20 U.S.C. § 1415(i)(2)(A). Following trial, the district court affirmed the administrative ruling and permanently enjoined the Academy from using the fifth grade standard. *See St. Johnsbury Academy v. D.H.*, 20 F.Supp.2d 675 (D.Vt.1998).

The Academy now appeals to this Court, arguing that the district court misapplied IDEA and the Rehabilitation Act. We vacate the injunction and direct the district court to enter judgment in favor of the Academy.

## BACKGROUND

### A. High School Education in the District

Under Vermont law, a school district that does not maintain a public high school has two options for educating its high school-age residents:

(i) The district may "designate an approved independent school as the public high school of the district" *if the school consents*, Vt. Stat. Ann. tit. 16, § 827(a), (b), in which case the district will pay tuition only to that school unless the district decides, in its sole discretion, that another high school "will best serve the interests of the pupil." *Id.* § 827(b)-(d). The Academy has not been so designated, and does not seek the designation.

(ii) The district may (as it has done in this case) pay tuition "to an approved public or independent high school, to be selected by the parents or guardians of the pupil, within or without the state." [2] *Id.* §§ 822(a)(1), 824; *see D.H.*, 20 F.Supp.2d at 680.

The overwhelming majority of the District's students choose to go to the Academy, which is the only approved high school in St. Johnsbury. *See D.H.*, 20 F.Supp.2d at 680, 683. But as conceded by D.H., the District, and the VDE, the Academy is not *required* to accept students from St. Johnsbury.

### B. The Academy's Special Education Program

The Academy provides special education services through a Resource Room Program and an Individualized Services Program. *See D.H.*, 20 F.Supp.2d at 680. The Resource Room Program "allows for students to be placed in regular academic classes," whereas students in the Individualized Services Program "are taught in a segregated classroom along with other individuals with disabilities and may be mainstreamed for non-academic activities." *Id.* To qualify for the Resource Room Program, a student must be able to perform at the fifth grade level.[3] *See id.*

### C. D.H.'s Application to the Academy

D.H., now twenty-two, has several disabilities, including cerebral palsy, a learning impairment, and a visual deficit. In spring 1993, he completed the eighth grade in the town's public middle school. The middle school educated D.H. in compliance with IDEA, which requires participating states to provide "all children with disabilities" a "free appropriate public education," or "FAPE". 20 U.S.C. § 1412(a)(1)(A). The particular services required to meet the child's educational needs must be set forth at least annually in a written individualized education plan ("IEP"). *See M.C. v. Voluntown Bd. of Educ.*, 226 F.3d 60, 62 (2d Cir.2000) (citing 20 U.S.C. § 1414(d)(4)(A)(i)). As provided in his

---

**2.** At the time this case was filed (according to *amicus* Vermont Independent Schools Association), 91 school districts in Vermont operated no public high school. Of those, five had agreements with "designated" independent high schools, pursuant to Vt. Stat. Ann. tit. 16, § 827; the rest, like the District in this case, gave parents a choice of schools.

**3.** All academic departments at the Academy offer courses at four levels of instruction: basic, standard, accelerated, and advanced placement. The basic level of instruction is geared towards students whose skills are weak, but who can function at a fifth grade achievement level.

eighth grade IEP, D.H. was mainstreamed with non-disabled students in at least some academic classes. *See D.H.*, 20 F.Supp.2d at 680.

Toward the end of the eighth grade school year, D.H. applied for admission to the Academy. The school agreed to educate him in the Individualized Services Program, but not in mainstream academic classes, because D.H. did not satisfy the fifth grade ability requirement. *See id.* D.H.'s foster parent refused to send him to the Academy under that condition, noting that the child's IEP for ninth grade called for a mainstream placement in two academic courses, English and Social Studies. *See id.* at 681.

As an alternative, the District offered placement at Lake Region High School in Orleans, Vermont. D.H.'s parent refused this offer too, citing a long daily commute and the inability of Lake Region to provide certain vocational training specified in the IEP. D.H.'s parent ultimately decided to have her child repeat the eighth grade.

D.H. (through his parent) challenged the Academy's position in an IDEA administrative due process action against the Academy and the District. *See* 20 U.S.C. § 1415(f)(1). On November 23, 1993, the administrative hearing officer ruled in favor of D.H., holding that IDEA and the Rehabilitation Act required the Academy to accept the child into its mainstream academic classes. The hearing officer also ordered the District to "influence the Academy to change" the fifth grade policy.

## D. The District Court Decision

The Academy appealed the administrative decision by filing a complaint against D.H., the District, and the VDE in the United States District Court for the District of Vermont, under 20 U.S.C.A. § 1415(e)(2) (West 1993); *accord* 20 U.S.C.A. § 1415(i)(2)(A) (West 2000). D.H. counterclaimed against the Academy

4. D.H. also asserted a claim arising under state education regulations. The district

and cross-claimed against the District, asserting violations of IDEA and the Rehabilitation Act.[4]

Following trial, the district court issued an interim order directing the Academy to admit D.H. and to educate him in the two mainstream academic classes identified by his IEP. *See D.H.*, 20 F.Supp.2d at 680–81. Nearly two years later, in September 1998, the court issued a published opinion holding that the fifth grade requirement violates IDEA and § 504(a) of the Rehabilitation Act. *See D.H.*, 20 F.Supp.2d at 682–90.

The district court's IDEA ruling was largely based on that Act's requirement that disabled students be placed in the "least restrictive environment," i.e., that students with disabilities be educated with non-disabled students whenever possible. *Id.* at 681, 686–89 (citing *Briggs v. Board of Educ.*, 882 F.2d 688, 692 (2d Cir.1989); 20 U.S.C. § 1412(a)(5)). According to the district court, the fifth grade standard inadequately accounted for the non-academic benefits that disabled students can reap when placed in mainstream academic classes. *See id.* at 687 ("Educational benefit should not be mistakenly equated with academic benefit alone."). The court also found that the "drawing of a single line to determine a student's program, based on an arbitrary grade level standard," conflicts with IDEA's mandate to design an "*individualized* education program." *Id.* at 681, 688 (emphasis added) (citing 20 U.S.C. § 1412(a)(4)).

Turning to the Rehabilitation Act, the court observed that—at least with respect to disabled students who are "qualified" under the statute—the requirements of the Rehabilitation Act resemble those of IDEA. The court recognized that somewhat different standards apply to public and private recipients of federal funds, but concluded nevertheless that the fifth grade requirement "runs afoul of Section 504 in general." *Id.* at 689.

court's pre-trial dismissal of that claim is not challenged on appeal.

To remedy these statutory violations, the district court permanently enjoined the Academy from using the fifth grade requirement to screen students from mainstream academic classes. *Id.* at 690. The court also awarded D.H. one year of compensatory education to make up for the year in which he repeated the eighth grade. *See St. Johnsbury Academy v. D.H.*, No. 93 CV 398, at 5–8 (D.Vt. Dec. 10, 1999). However, the court found that injunctive relief against the District was "neither warranted nor necessary" because the "District fully supported D.H.'s claim" against the Academy. *Id.* at 2.

## DISCUSSION

■ We "may overturn an order granting a permanent injunction if the district court relied upon a clearly erroneous finding of fact or incorrectly applied the law." *Rodriguez v. City of New York*, 197 F.3d 611, 614 (2d Cir.1999) (internal quotations omitted). Thus, we review *de novo* questions of law and mixed questions of law and fact. *See J.D. v. Pawlet Sch. Dist.*, 224 F.3d 60, 64 (2d Cir.2000) (reviewing *de novo* the application of statutory and regulatory definitions in an IDEA case).

## I. IDEA

### A. Mootness

■ At oral argument, we questioned *sua sponte* whether this case may be moot because D.H. was then (as he is now) between his 22nd and 23rd birthdays. Our decision in *Burr v. Ambach*, 863 F.2d 1071 (2d Cir.1988), as well as some decisions in other circuits, could be read to hold that an IDEA claimant "ages out" on his twenty-first birthday. *See id.* at 1075, 1078–79 (addressing whether an award of compensatory education to remedy IDEA violations can "continue beyond a child's twenty-first birthday"); *Board of Educ. v. Illinois State Bd. Of Educ.*, 79 F.3d 654, 656 (7th Cir.1996) ("the Act entitles disabled individuals to special education assistance only until they reach the age of 21");

*Parents of Student W. v. Puyallup Sch. Dist.*, 31 F.3d 1489, 1497 (9th Cir.1994) (IDEA benefits expire upon "reaching age 21"). *But see Pihl v. Massachusetts Dep't of Educ.*, 9 F.3d 184, 189 (1st Cir.1993) ("he ceased to be eligible for educational services under the IDEA in 1988, when he turned 22"). If so, this case would be moot notwithstanding the year of compensatory education awarded by the district court.

After reviewing supplementary briefs from the parties, we conclude that IDEA originally entitled D.H. to a FAPE until his *22nd* birthday. The additional year of IDEA coverage awarded by the district court thus preserves the case from mootness.

■ Under 20 U.S.C. § 1412(a)(1)(A), IDEA applies to persons "between the ages of 3 and 21, inclusive." The word "inclusive," which must be given meaning, is unnecessary to assure the inclusion of someone aged four, or someone aged 14, or even someone in his 20th year (which culminates in his 21st birthday); their inclusion is obvious without the emphasis. If the word "inclusive" is to mean something, as it must, it means that the relevant period begins on a child's third birthday and ends on the last day of his 21st year (which culminates in his 22nd birthday).

This reading is confirmed by other IDEA provisions that use the preposition "through" to bracket ages. Subparagraph § 1412(a)(1)(B), which conforms the age coverage of IDEA to the ages in which each state affords a public education, references children "18 through 21":

> [IDEA] does not apply with respect to children *aged 3 through 5* and *18 through 21* in a State to the extent that its application to those children would be inconsistent with State law or practice, or the order of any court, respecting the provision of public education to children in those age ranges.

20 U.S.C. § 1412(a)(1)(B)(i) (emphasis added); *see also* § 1412(a)(1)(B)(ii) (states

need not supply IDEA services to certain incarcerated children "aged 18 through 21"). When this subparagraph is read together with 20 U.S.C. § 1411(a)(2), which concerns the maximum federal aid that a state may receive in one year, it is clear that "aged ... 18 through 21" in subparagraph § 1412(a)(1)(B)(i) is a period that must extend for so long as the child is 21, and cannot be a period that ends on the child's 21st birthday. Thus § 1411(a)(2) computes maximum funding as:

(A) the number of children with disabilities in the State who are receiving special education and related services—

(i) *aged 3 through 5* if the State is eligible for [preschool grants under § 1419]; and

(ii) *aged 6 through 21;* multiplied by

(B) 40 percent of the average per pupil expenditure [in the U.S.].

§ 1411(a)(2) (emphasis added). Unless Congress intended to exclude five year-olds from the funding formula, children "aged 3 through 5" must mean children for so long as they are five. We conclude that "aged 6 through 21" in § 1411 and "aged ... 18 through 21" in § 1412 should be read in the same inclusive way.

Our reading is further confirmed by IDEA regulations. Thus, unless otherwise dictated by state law or practice, IDEA applies to "children with disabilities aged 3, 4, 5, 18, 19, 20, *and 21* within the State." 34 C.F.R. § 300.300(a), (b) (emphasis added); *see also* 34 C.F.R. § 300.122(a)(1) ("The obligation to make FAPE available to all children with disabilities does not apply with respect to ... [c]hildren aged 3, 4, 5, 18, 19, 20, *or 21* in a State to the extent that its application to those children would be inconsistent with State law ....") (emphasis added). In sum, we think that IDEA eligibility (subject to extension in a proper case) may continue until the day the claimant turns 22.

Our decision in *Burr v. Ambach* does not hold otherwise, because in that case the significance of the claimant's 21st birthday turns on New York law and the discussion of the point naturally concerns New York law (not IDEA). The New York statute at issue, cited in the *Burr v. Ambach* district court opinion, provides that only "person[s] over five and *under twenty-one* years of age" are eligible to receive a public education. N.Y. Educ. Law § 3202(1) (McKinney 1995 & Supp. 2000) (emphasis added); *id.* (McKinney, Westlaw 1987) (same); *see Burr v. Ambach,* No. 86 Civ. 7164, 1987 WL 19957, at *1 (S.D.N.Y. Nov.10, 1987). *Burr* also cites a New York provision that each school district ascertain "the number of children with handicappping conditions in such district *under the age of twenty-one* years." N.Y. Educ. Law § 4402(1)(a) (McKinney 1995 & Supp.2000) (emphasis added); *id.* (McKinney, Westlaw 1987) (same); *see Burr,* 1987 WL 19957, at *1.

As noted above, IDEA applies to children "aged ... 18 through 21" only if that *is* consistent with State law on the provision of public education. 20 U.S.C. § 1412(a)(1)(B)(i). Obviously, the New York statutes at issue in *Burr* were *not* consistent with an application of IDEA beyond the 21st birthday; so IDEA afforded the plaintiff no basis for contesting the point that ordinarily he would have aged out on his 21st birthday. Rather, he claimed "an award of compensatory public education beyond his twenty-first birthday" to make up for the deprivation of a free education for a period of time before he reached that age, *Burr,* 1987 WL 19957, *1, and our holding was that an award of compensatory education *beyond* the 21st birthday was proper for that reason. *See Burr,* 863 F.2d at 1078.

Finally, we conclude that Vermont law (unlike New York law) is consistent with an application of IDEA to children through their 21st year. A proposed regulation expressly affords IDEA-funded special education services to children until "their 22nd birthday." Vt. St. Bd. of Educ. R. 2360.2 (proposed Mar. 31, 2000). Counsel for the VDE stated at oral argument that

this proposed regulation reflects Vermont's current policy. The proposed regulation also is fully consistent with current state rules, which use the phrase "*through* twenty-one years of age." Vt. St. Bd. of Educ. R. 2360.3(b)(i) (emphasis added); *id.* 2360.4 (same); *see also* Vt. Stat. Ann. tit. 16, § 1073(a) (defining a legal pupil as "an individual who has attained the age of five years" but *not* specifying an upper age limit); *id.* § 2944(e) (allowing the provision of special education services to a disabled child "having attained the age of 21").

This case is live, so we proceed to the merits.

## B. The Merits

■ The Academy argues that its fifth grade requirement for mainstream academic high school classes cannot violate IDEA because the school is not directly subject to the statute's standards. We agree.

In 1989, the VDE posed a closely related question to the Office for Special Education Programs of the U.S. Department of Education ("OSEP"), the federal office that is responsible for administering IDEA. *See* 20 U.S.C.A. § 1402(a) (West 2000); 20 U.S.C.A. § 1402(a) (West 1990). The VDE's Legal Counsel asked OSEP to provide a "formal interpretation" of federal regulations related to the "general standards for private schools which serve eligible handicapped children." Letter to Reedy, 16 E.H.L.R. 1364, at *3 (1989). The VDE's Legal Counsel explained that

Vermont presently is developing state regulations which would establish standards for private schools that would enable such schools to receive public tuition funds for serving students pursuant to [IEP's]. The dilemma we face is how to ensure that our standards are consistent with federal requirements while at the same time preserving the independence of Vermont's private schools that serve children with handicapping conditions.

*Id.* The question posed was whether "private schools [are] bound by the same admission and discipline policies that apply to the public schools?" *Id.* at *4. OSEP's responding Policy Letter makes clear that in all cases IDEA's obligations fall upon "the public agency," not the private school:

When a public agency places a child who is disabled in a private school or facility for the purposes of providing that child with FAPE, it does so as a means of providing that child with an educational program that it was unable to provide that child [ (citing 20 U.S.C. § 1412) ]. Thus, *the public school remains responsible for the education of the child and for ensuring that the child "has all the rights of a handicapped child served by a public agency."* (quoting 34 C.F.R. § 300.401(b) (1990); *accord* 34 C.F.R. § 300.401(c) (2000)). . . .

With respect to admission, *if a private school or facility is unable or unwilling to provide an appropriate educational program for a child who is disabled, the public agency remains responsible for providing, or ensuring the provision of, a FAPE to that child,* either by locating another appropriate private school placement for the child or by educating the child in a public agency program. With respect to discipline, where a child who is disabled requires disciplinary action, *the public agency* responsible for the education of the child *must ensure* that any disciplinary action that is administered to the child meets applicable [IDEA] requirements.

*Id.* at *8 (emphasis added). The Policy Letter also contemplated that the public agency could perform its obligations by negotiating enforceable agreements with the private schools: "For example, public agencies may include provisions regarding the administration of discipline in their *contractual relationships* with private schools that accept publicly-placed students." *Id.* at *8 n. 3 (emphasis added).

We need not decide whether OSEP's interpretation is entitled to deference, be-

cause we independently conclude that it is fully supported by the statute and regulations. *Cf. Honig v. Doe*, 484 U.S. 305, 325 n. 8, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988) (noting that deference to an OSEP policy letter may be appropriate where the statutory language is ambiguous). *But cf.* Individuals with Disabilities Education Act Amendments for 1997, Pub.L. No. 105–17, § 101, § 607(f)(1), 111 Stat. 37, 48 (codified at 20 U.S.C.A. § 1406(f)(1) (West 2000)) (requiring the Secretary of Education to include in written responses to policy questions "an explanation that the written response is provided as informal guidance and is not legally binding").

IDEA expressly contemplates that children will be "placed in ... [private] schools or facilities by the State or appropriate local educational agency as the means of" complying with the statute, and with respect to such children, the statute obligates the *"State"*—not the private school—to *"ensure"* that such children "are provided special education and related services, in accordance with an individualized education program." 20 U.S.C. § 1412(a), (a)(10)(B)(i) (emphasis added); *see also* 34 C.F.R. §§ 300.400, 300.401.

■ IDEA's implementing rules reinforce the principle that IDEA applies only to the State and other public agencies, *not* to private schools in which public agencies may place children. The rules are "binding on each public agency in the State that provides special education and related services to children with disabilities."[5] 34 C.F.R. § 300.2(b)(2). But when it comes to the regulations' "[a]pplicability" to "private schools", § 300.2(c)(1) simply provides that "[e]ach public agency in the State is responsible for ensuring that the rights and protections under [IDEA] are given to children with disabilities ... placed in private schools and facilities by that public agency."

5. The Academy clearly is not an "public agency," a term that the regulations define to include the "political subdivisions of the State

The regulations expressly contemplate that the "individualized educational program" and "least restrictive environment" requirements will be enforced when a public agency places children in a private school. But under 34 C.F.R. § 300.341, it is the *"public agency"* that must *"[e]nsure* that an IEP is ... implemented for each eligible child placed in or referred to a private school or facility by the public agency." *Id.* (emphasis added). At the "discretion of the public agency," the private school may conduct meetings and revise the IEP. *Id.* § 300.349(b). "Even in such cases, however, 'responsibility for compliance with [IDEA] remains with the public [agency].'" *McKenzie v. Smith*, 771 F.2d 1527, 1531 (D.C.Cir.1985) (quoting 34 C.F.R. § 300.347 (1985); *accord* 34 C.F.R. § 300.349(c) (2000)); *see also Fuhrmann v. East Hanover Bd. of Educ.*, 993 F.2d 1031, 1037 n. 5 (3d Cir.1993) (noting that these regulations are "aimed at ensuring that a public agency that would otherwise be responsible for the education of a handicapped child does not abdicate that responsibility merely because a child is or will be enrolled at a private institution").

The same principle applies to the requirement that children be educated in the least restrictive environment: "Each *public agency shall ensure*" that "to the maximum extent appropriate, children with disabilities ... in ... private institutions ... are educated with children who are nondisabled." 34 C.F.R. § 300.550(b)(1) (emphasis added); *see also* 20 U.S.C. § 1412(a)(5)(A) (same). Moreover, the least restrictive environment regulation—like OSEP's 1990 Policy Letter (discussed above)—contemplates that public agencies may implement its requirements by "making arrangements with ... private" schools, "such as a memorandum of agreement or special implementation procedures." 34 C.F.R. § 300.554; *see* Letter to Reedy, 16 E.H.L.R. 1364, at *8 n. 3.

that are responsible for providing education to children with disabilities." *Id.* § 300.22.

**172**

■ Our conclusion regarding the Academy's responsibilities is further reinforced by the fact that D.H. has no IDEA cause of action against the school. The "right to bring a civil action" that IDEA creates is the right of a party "aggrieved by the findings and decision made under subsections (f) or (k) of" 20 U.S.C. § 1415. *Id.* § 1415(i)(2). Subsection (k), which addresses procedures for disciplining disabled children, is not relevant to this case. Subsection (f) prescribes that IDEA complaints relating to a child's placement will be resolved through an administrative "due process hearing, which shall be conducted by the State educational agency ["SEA"] or by the local educational agency ["LEA"], as determined by State law or by the [SEA]." 20 U.S.C. § 1415(f)(1); *see M.C.*, 226 F.3d at 62–63. Vermont's implementing legislation provides that "[a]n action *against a local, intermediate, or state education agency* seeking enforcement of special education rights under state or federal law shall be commenced by an administrative due process hearing within two years of the alleged violation."[6] Vt. Stat. Ann. tit. 16, § 2957(a) (emphasis added). Vermont does not provide for a similar action against a private school. *Cf. Johnson v. Independent School Dist. No. 4*, 921 F.2d 1022, 1031 (10th Cir.1990) (per curiam) (holding that under Oklahoma law only LEAs are proper parties to an IDEA due process hearing).

The district court held that the Academy was a proper defendant on the ground that the Academy was "an LEA for purposes of

IDEA." *D.H.*, 20 F.Supp.2d at 682, 684. We disagree. The statutory definition of an LEA, which we reproduce in the margin,[7] has no room for the Academy. With narrow irrelevant exceptions, an LEA is by definition a public entity (rather than a private one) and an administrative body (rather than a school itself). And among the functional differences between private schools and LEAs, LEAs are entitled to receive at least 75% of a state's IDEA monies on the condition that they provide a FAPE to disabled students in their jurisdictions. §§ 1411(g)(1), 1413(a)(1). A private school has no such entitlement.

The VDE argues that it has in fact entered into an enforceable arrangement with the Academy to implement IDEA standards. The understanding assertedly appears in a "Stipulation of Settlement" under which the Academy received state approval to educate disabled students. However, the document appears merely to create a procedure for negotiating disagreements between the Academy and the District. But even if the Stipulation did confer on the VDE (or the District) rights against the Academy, the agencies did not assert a cause of action enforcing that Stipulation in the district court. The only state law claim in this case was asserted by D.H. and arose under Vermont State Board of Education Rules. The claim was dismissed by the district court in an order from which no appeal was taken.

We do not mean to imply that arrangements between a public agency and a pri-

---

**6.** The reference to an "intermediate" educational agency is vestigial: that term was used in the pre–1997 version of IDEA, but not in the current version. *See* 20 U.S.C.A. § 1401(a)(23) (West, Westlaw 1997). The new regulatory definition of LEA includes those entities covered by IDEA's pre–1997 definition of "intermediate educational unit." 34 C.F.R. §§ 300.10(c), 300.18(b)(1) (2000).

**7.** "Local educational agency" means

a *public* board of education or other *public* authority legally constituted within a State for either administrative control or direction of, or to perform a service function

for, *public* elementary or secondary schools in a city, county, township, school district, or other political subdivision of a State, or for such combination of school districts or counties as are recognized in a State as an administrative agency for its *public* elementary or secondary schools.

20 U.S.C. § 1401(15)(A) (emphasis added). The term also includes "any other *public* institution or agency having administrative control and direction of a *public* elementary or secondary school," and certain schools funded by the Bureau of Indian Affairs. *Id.* § 1401(15)(B), (C) (emphasis added).

vate school are not enforceable against the private school. Public agencies are the only entities directly responsible under IDEA, but one responsibility of such agencies is to "mak[e] arrangements" for the implementation of IDEA standards with private institutions that are willing and able to strike a deal. 34 C.F.R. § 300.554; *see id.* § 300.301(a) ("[A] State may use whatever ... private sources of support are available in the State to meet the requirements of this part."); *id.* § 300.302 (authorizing the placement of a disabled child in "a public or private residential program" when "necessary to provide special education and related services"). The regulations clarify that "[n]othing in this part relieves an insurer or similar third party from an otherwise valid obligation to provide or to pay for services provided to a child with a disability." 34 C.F.R. § 300.301(b).

For the foregoing reasons, we vacate the injunction and direct the district court to enter judgment in favor of the Academy. This appeal presents no issue bearing on whether D.H. may still have IDEA rights against the District and the VDE, which are the LEA and SEA (respectively) in this case. The district court declined to grant any such relief in part because the court found it unnecessary to do so in light of the relief ordered against the Academy.

## II. Rehabilitation Act

Section 504(a) of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29

U.S.C. § 794(a). The district court held that the Academy violated D.H.'s rights under § 504(a) by excluding him from mainstream academic classes, and that the fifth grade competence requirement for admission to those classes violated the § 504(a) "in general." *D.H.*, 20 F.Supp.2d at 689.

■ By its terms, § 504(a) does not compel private educational institutions to "disregard the disabilities of handicapped individuals or to make substantial modifications in their programs to allow disabled persons to participate." *Southeastern Community College v. Davis*, 442 U.S. 397, 405, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979). The law requires only that an "otherwise qualified individual with a disability" not be "excluded from participation in a federally funded program 'solely by reason of' " his disability. *Id.* (quoting § 504(a)). This prohibition means "only that mere possession of a handicap is not a permissible ground for assuming an inability to function in a particular context." *Id.*

■ The test for determining whether a person is "otherwise qualified" under the statute "is well settled." *Teahan v. Metro–North Commuter R.R. Co.*, 80 F.3d 50, 53 (2d Cir.1996). The person must be " 'able to meet all of a program's requirements *in spite of* his handicap.' " *Id.* (quoting *Davis*, 442 U.S. at 406, 99 S.Ct. 2361 (emphasis added)). The definition does *not* include someone "who would be able to meet the requirements of a particular program in every respect *except as to the limitations imposed by* their disability." [8] *Davis*, 442 U.S. at 406, 99 S.Ct. 2361 (emphasis added).

Under the catch-all regulatory definition that is applicable to private school ser-

---

**8.** The Rehabilitation Act's regulations, in fact, use the word "qualified" instead of the statutory term "otherwise qualified." The adjusted terminology reflects the U.S. Department of Education's belief that " 'read literally, 'otherwise' qualified handicapped persons include persons who are qualified *except for* their handicap, rather than *in spite of* their handicap. Under such a literal reading, a blind person possessing all the qualifications for driving a bus except sight could be said to be 'otherwise qualified' for driving.' " *Davis*, 442 U.S. at 407 n. 7, 99 S.Ct. 2361 (quoting 45 C.F.R. pt. 84, App. A, p. 405 (1978); *accord* 34 C.F.R., Part 104, App. A, p. 353 (2000)) (emphasis added).

vices, a disabled student is "qualified" if he "meets the essential eligibility requirements for the receipt of such services." 34 C.F.R. § 104.3(*l*)(4); *see Rothschild v. Grottenthaler*, 907 F.2d 286, 291 (2d Cir. 1990) (noting that the meaning of "qualified" under the regulations depends on "the category of service offered" by the federal funds recipient); *Hunt v. St. Peter School*, 963 F.Supp. 843, 851 (W.D.Mo. 1997) (the catch-all definition of "qualified" applies to private schools).[9]

■ D.H. did not make out a *prima facie* claim under § 504(a), because he is not " 'qualified' " for mainstream academic classes at the Academy. *Mrs. C. v. Wheaton*, 916 F.2d 69, 74 (2d Cir.1990) (*prima facie* case under § 504(a) requires that a plaintiff prove, *inter alia*, that "he is 'otherwise qualified' for the program") (quoting 29 U.S.C. § 794(a)). D.H.'s inability to perform at the fifth grade level means that he cannot satisfy "all of" the high school "program's requirements." [10] *Davis*, 442 U.S. at 406, 99 S.Ct. 2361; *see* 34 C.F.R. § 104.3(*l*)(4).

We would be presented with a different case if the program requirement at issue were " 'unreasonable and discriminatory,' " but it is neither. *Rothschild*, 907 F.2d at 293 (quoting *Davis*, 442 U.S. at 413, 99 S.Ct. 2361). All departments at the Academy offer courses at four levels of instruction: basic, standard, accelerated, and advanced placement. A disabled student skilled at or above the fifth grade level is placed in a basic class and receives assistance with respect to his disability through the school's Resource Room Program; a disabled student who is not skilled at or above the fifth grade level is educated in the school's Individualized Services Program. This arrangement clearly represents a "legitimate academic policy" with respect to the school's students, disabled and non-disabled alike. *Davis*, 442 U.S. at 413 n. 12, 99 S.Ct. 2361. D.H. argues that the fifth grade requirement for ninth grade classes sets the bar too high; but "nothing in the [Rehabilitation] Act requires an educational institution to lower its standards." *Id.* D.H.'s Rehabilitation Act claim therefore fails.

## CONCLUSION

The injunction is vacated and the district court is directed to enter judgment in favor of the Academy. The judgment is further vacated insofar as it denies injunctive relief against the District, and D.H.'s claims against the District are remanded for any further proceedings. The mandate shall issue forthwith.

---

9. The definition of "qualified" in the context of *public* secondary educational services differs markedly. A student is "qualified" for those services merely if he is "of an age during which non-handicapped persons are provided such services." 34 C.F.R. § 104.3(*l*)(2)(i).

10. At one point, the district court opinion recites that the Academy "does not dispute the existence of a prima facie case," *D.H.*, 20 F.Supp.2d at 688, but that is not how we read the record. The parties also view the issue as disputed. Thus the VDE's appellate brief addresses the "otherwise qualified" element on the merits, and states that the Academy "is not contesting" two other elements of the § 504(a) prima facie case.